## In re BELL TOWER ASSOCIATES, LTD. a Texas limited partnership, Debtor.

**Bankruptcy No. 88 B 10216 (HCB).**

United States Bankruptcy Court, S.D. New York.

May 26, 1988.

McCarter & English, Newark, N.J. by Theodore D. Moskowitz, for First Irving Apartments Joint Venture of Las Colinas, LBI Management Inc. and University Sav. Assn.

Summit Rovins & Feldesman, New York City by Alan Kolad, Alan E. Gamza, for debtor.

Davis Polk & Wardwell, New York City by Lauren Bedell, for Morgan Guar. Trust Co. of New York.

Stroock & Stroock & Lavan, New York City by Robin Keller, for Betsy L. Turner and certain Limited Partners.

## DECISION AND ORDER

HOWARD C. BUSCHMAN III, Bankruptcy Judge.

Movants, First Irving Apartments Joint Venture of Las Colinas ("First Irving"), LBI Management Inc. ("LBI") and University Savings Association ("USA"), seek an order dismissing or transferring this case pursuant to 28 U.S.C. Section 1408 and Bankruptcy Rule 1014(a)(2) alleging that venue improperly lies in the Southern District of New York. Alternatively, movants seek this Court to transfer the case in the interest of justice or for the convenience of the parties pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014(a)(1). The Debtor, Morgan Guaranty Trust Company of New York and certain limited partners oppose dismissal or transfer.

### I.

Bell Tower Associates, Ltd. (the "Debtor" or the "Partnership" or "Bell Tower") is a Texas limited partnership that was formed in order to acquire Bell Tower at Las Colinas Apartments (the "Apartments"). The limited partnership agreement and Partnership prospectus state that the Partnership's principal place of business is in Irving, Texas. The Partnership consists of TPI–Bell Tower Inc. ("TPI"), as general partner and thirty-five limited partners who have purchased partnership units at $68,000 per unit pursuant to a private offering.[1] TPI is affiliated with TPI Equities, Inc., Turner Properties, Inc. and Turner Management, Inc., which all are New York corporations. The Apartments, built in 1985, consist of a 334 unit garden apartment complex located on approximately 14½ acres and is part of a planned development in the Las Colinas section of Irving, Texas, located between Dallas and Fort Worth. They are the Debtor's principal asset.

---

**1.** Twenty-two of the thirty five limited parties live in New York or contiguous states. One limited partner lives in Texas and the remainder are scattered throughout the United States.

In order to acquire the Apartments, on or about October 23, 1985, TPI entered into a Purchase and Sales Agreement ("Purchase Agreement") which provided for the sale of the Apartments from First Irving to TPI. First Irving is a Texas joint venture formed by USA and Lan Bensten d/b/a Lan Bensten Interests and is engaged, *inter alia,* in the business of real estate loans and investments.

The Purchase Agreement provided for a purchase price of $17,352,500 of which the Debtor paid $845,000 in cash. Bell Tower financed the balance of the purchase price by executing a $13,300,000 First Mortgage Note to USA and a $3,207,500 Second Mortgage Note to First Irving. The security for the First and Second Mortgage Notes included a Vendor's Lien reserved in a Deed, a Deed of Trust, and a Wrap–Around Deed of Trust and Security Agreement covering the Apartments and any and all rights, revenues, benefits, leases, contracts, accounts, general intangibles, money, instruments, documents, tenements, heritaments and appurtenances owned by the Debtor arising out of or belonging to the Apartments. In May 1986, USA and the Debtor restructured the original $13,300,000 First Mortgage Note by the Debtor's issuance of a new note in the amount of $13,800,000 at a reduced interest rate.

The original purchase was structured to include two years of management by an affiliate of the seller, LBI Management, Inc. ("LBI"), who was to lease the units on a projected schedule until 95% occupancy was reached in accordance with a Management Agreement (Exhibit 3, Steir Affidavit, § 2.2). The Management Agreement provided for LBI "to operate in the same manner as was customary and usual in the operation of comparable facilities" until December 1, 1987 and then for the Debtor to undertake the management of the Apartments as of that date. The Management Agreement further provided that LBI was not to enter into leases with tenants charging an average rental of less than $0.63 per square foot without the consent of the Debtor and that the agreement could be extended upon consent of the parties. Pursuant to a Guaranty Agreement, LBI was to reimburse the Debtor for any negative cash flow on the project, capped at $187,500 per month, for a period of two years after closing.

The Debtor, on May 30, 1987, failed to make a payment in the amount of $999,258 required by the Second Mortgage Note. First Irving threatened foreclosure. The Debtor claimed that such payment was withheld due to maintenance and management problems at the property, commenced an action in the Texas state courts against First Irving and obtained a temporary restraining order enjoining foreclosure. The parties then settled their differences and agreed to modify the first and second mortgages and formulate a new payment schedule.

In early December 1987, the Debtor failed to make a payment pursuant to the Second Mortgage Note. The Debtor asserted that it refused to make payment since repairs agreed to by First Irving were not undertaken by LBI. The parties then further modified their arrangements, agreeing that LBI would continue to manage the Apartments until such time as the Debtor completed its obligations.

Irrespective of the aforementioned attempts by the parties to work out their differences, in January, 1988, the Debtor again defaulted and First Irving began non-judicial foreclosure proceedings in Texas. A foreclosure sale was scheduled for the afternoon of February 2, 1988 and on the morning of that day the Debtor filed a Chapter 11 petition for relief in this Court.

In its statement of liabilities, the Debtor asserts that its indebtedness to First Irving is $1,151,758 and that its indebtedness to USA is $13,300,000. After those creditors, the Debtor's largest creditor is Morgan Guaranty Trust Company of New York ("Morgan") in the amount of $3,700,000. Apparently, Morgan holds $315,000 in cash and $3,840,000 in limited partner's promissory notes as collateral for that loan.

Simultaneously, with filing its Chapter 11 petition, the Debtor commenced an adversary proceeding in this Court seeking turnover of the Apartments. The com-

plaint alleges that LBI did not take measures necessary to bring the occupancy levels up to the standard of comparable properties in the area and that did not properly maintain the Apartments. First Irving, by notice of motion dated February 11, 1988, then sought an order from this Court in order to vacate the automatic stay, dismiss the bankruptcy case or transfer the case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

This Court scheduled a hearing on the venue motion for February 24, 1988. On that date, however, it was agreed by the parties in chambers that the most efficient way to proceed was for this Court to be hear arguments on the Debtor's turnover proceeding and First Irving's motion to vacate the automatic stay since the underlying legal issues are intertwined.[2] That evidentiary hearing commenced on March 9, 1988. The parties then commenced settlement discussions resulting in a post-petition Stipulation Agreement that was approved by this Court on March 11, 1988 without prejudice to the parties. Unfortunately, that agreement fell through and First Irving filed a motion to reinstate its motion to vacate the automatic stay, resume proceedings, adopt the record and limit proceedings. At the hearing it expanded that request to include its venue motion. The court thereupon scheduled the venue motion in advance of the other matters. Arguments were heard on May 12, 1988.

Essentially, First Irving grounds its venue motion on two points. First, it asserts that the Debtor's Chapter 11 Petition was improperly filed in New York pursuant to 28 U.S.C. § 1408 and Bankruptcy Rule 1014(a)(2) on the ground that the Debtor's

principal place of business is in Irving, Texas. In the alternative, it argues that the case should be transferred to Texas pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014(a)(1) for the convenience of the parties based upon the factors enumerated by the Fifth Circuit in *Commonwealth of Puerto Rico v. Commonwealth Oil Refining Company, Inc. (In re Commonwealth Oil Refining Company, Inc.)*, 596 F.2d 1239, 1247 (5th Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980), or in the interests of justice.[3]

## II.

Whether or not the Debtor's bankruptcy petition was properly filed in this District is governed by 28 U.S.C. § 1408. That provision provides:

... a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or the principal assets in the United States of the person or entity that is the subject of such case have been located ...

Thus, in order to determine if the Debtor's Chapter 11 case properly belongs in this District, we must determine whether or not the Debtor's domicile, residence, or principal place of business is in this District or if the Debtor's principal assets are located here. If not, then, in accordance with Bankruptcy Rule 1014(a)(2), "the case may be dismissed or transferred to any other district if the court determines that transfer is in the interest of justice or for the convenience of the parties."[4] The burden

---

2. The Debtor also moved for an order permitting use of cash collateral and rejecting the management agreement with LBI.

3. If the case were transferred, First Irving agrees that it will request the Bankruptcy Court for the Northern District of Texas to adopt the record as it exists. In the alternative, First Irving would seek this Court to complete the trial of the motion to vacate the automatic stay which began on March 9, 1988, prior to transferring the case to Texas.

4. Although there remains some debate as to whether a bankruptcy court can directly order a transfer of venue to another district, in this District such motions are treated as core matters under 28 U.S.C. § 157(b)(2)(A) which are heard pursuant to the District Court's order of reference under 28 U.S.C. § 157(a). *Accord In re John Waits*, 70 B.R. 591, 594 (Bankr.S.D.N.Y. 1987).

With the 1986 amendment to Rule 1014(a)(2), the Court may not retain the case when venue is not proper under 28 U.S.C. § 1408.

rests on the movants to demonstrate by a preponderance of the evidence that the Chapter 11 petition was filed in the wrong district. *See In re Hudson River Navigation Corp.*, 59 F.2d 971, 973 (2d Cir.1932); *In re Baltimore Food Systems, Inc.*, 71 B.R. 795, 798 (Bankr.D.S.C.1986); *In re Holiday Towers, Inc.*, 18 B.R. 183, 186 (Bankr.S.D.Ohio 1982); *In re Gulf Manufacturing Corp.*, 4 Bankr.Ct.Dec. (CRR) 521, 522 (Bankr.S.D.N.Y.1978).

It is undisputed that the Debtor's principal asset, the Apartments, is located in Texas. The fact that the Debtor is a partnership, however, makes its domicile and residence not so apparent.

While a partnership may have a principal place of business or may have a district in which it has its principal assets, it is difficult to see how a partnership can be said to have a residence or domicile. For example, even declarations of a partner concerning his own residence in a particular district do not give venue over the partnership even if effective to estop that partner individually. Thus, the only meaningful venue test with respect to a partnership may be the district in which it has its principal place of business or its principal assets in the United States.

1 *Collier on Bankruptcy,* ¶ 3.02[c][ii] at 3–113 (15th Ed.1987); *see also In re 1606 New Hampshire Avenue Associates,* 85 B.R. 298 (Bankr.E.D.Pa.1988); *In re Nantucket Apartments Associates,* 80 B.R. 154 (Bankr.E.D.Mo.1987); *In re Monterey Equities–Hillside,* 73 B.R. 749, 753 (Bankr.N. D.Cal.1987). Thus, the focus of our inquiry is necessarily limited to the Debtor's principal place of business. That issue is a question of fact. *Commonwealth Oil Refining Company, Inc.,* 596 F.2d at 1241.

█ Here, it is undisputed that the sole asset of the Debtor is in Texas and its day-to-day operation appears to be managed from Texas. Although a debtor's principal place of business is not necessarily at the same location as its principal assets, *see Commonwealth Oil Refining Company, Inc.,* 596 F.2d at 1244–45, Charles D. Prosser III, TPI's vice-president who is in charge of the operation of the

Apartments, is located in Houston, Texas, and LBI manages the day-to-day operation of the Apartments in Irving, Texas. (*See* Affidavit of Charles D. Prosser, III In Support Of Motion For An Order Fixing Defendant's Time To Answer Or Move And Scheduling An Expedited Trial, p. 1). Since the decisions regarding the day-to-day operation of the sole asset are made in Texas, it can be argued that case properly belongs there. *Accord Commonwealth Oil Refining Company, Inc.,* 596 F.2d at 1242 (venue properly lay in San Antonio, where the company's physical operations were controlled from on a daily basis, rather than Puerto Rico, where the assets were located); *see also In re Nantucket Apartments Associates,* 80 B.R. at 156; *In re Dock of the Bay, Inc.,* 24 B.R. 811, 814–15 (Bankr. E.D.N.Y.1982).

In response, the Debtor asserts that its principal place of business is in New York since twenty-two of the Debtor's thirty-five limited partners are located in or near the New York Metropolitan area and New York is where the Debtor's general partner is and maintains the Debtor's records and makes business decisions concerning the Debtor.

The location of residences of limited partners generally is not relevant to the location of the Debtor's principal place of business. Limited partners, by definition, do not participate in a partnership's decision-making process. By the same token, the general partner does participate in that process. In this case, it maintains records in New York, issues checks from New York and distributes notices to the Debtor's limited partners from New York.

In addition, the Debtor stresses that First Irving and USA sent notices of the Debtor's defaults to the Debtor in New York. But examination of those notices indicates that they were sent to the Debtor in care of its general partner. There is nothing that indicates that the Debtor, itself, has a lease or a telephone listing in New York. It uses the printed letterhead of Turner Properties. Furthermore, the Debtor's statement in the Partnership Agreement and its prospectus that its prin-

cipal place of business in Texas is entitled to weight particularly since that selection coincides with the state in which the debtor performs its day-to-day operations. *In re Hudson River Navigation Corp.*, 59 F.2d at 973–74. More weight should be given where, as here, the limited partners were offered the opportunity, prior to bankruptcy, to recast the Partnership as a New York partnership and apparently did not act on the request. (*See* First Irving Affidavit Exhibit A, item 17—status report from Betsy Lee Turner to Limited Partners dated December 10, 1987). But that factor is not determinative by itself. *See In re Dock of the Bay, Inc.*, 24 B.R. at 814.

In no case cited by the Debtor is a principal place of business found merely because the debtor's chief executive works in or its general partner has its offices in a particular district absent some indication of the debtor's physical presence in that district. While the "nerve center" analysis principally articulated in *Commonwealth Oil* seeks to equate principal place of business with the offices where the debtor makes its major business decisions, there, the debtor at least had its offices in the district. *Compare In re Dock of the Bay, Inc.*, 24 B.R. at 815 (venue improper where debtor had no business address or telephone number in district) *with In re Boca Development Associates*, 18 B.R. 648, 651–52 (Bankr.S.D.N.Y.1982) (venue proper in New York since debtor was organized pursuant to the laws of New York and debtor's financial office was located in New York). To find a principal place of business where a debtor has no physical presence and was formed pursuant to the laws of another state is an anomaly that could not have been contemplated by Congress in enacting 28 U.S.C. § 1408.

Here, the facts are not quite so stark. There are pieces of correspondence addressed directly to the Debtor at a New York City address and not merely to it in care of the general partner. There is no indication that the envelopes in which they

were sent were not similarly addressed and that the Debtor did not have a presence in New York. It is uncontested that Betsy Lee Turner, the promoter of the partnership and the principal owner of the Turner group of properties, including the general partner of the Debtor, does make over-all management decisions in New York. Persons working for her participate in that endeavor.

Thus, in this close case on this issue, we hold that the movants have not met their burden of proof of showing that the Debtor's principal place of business is not in New York. There is, for example, no evidence that the Debtor does not pay taxes in New York or made key management decisions in Texas that would complement the Debtor's statement that its principal place is in Irving, Texas.

### III

We thus turn to whether this case should be transferred to the Northern District of Texas. 28 U.S.C. § 1412 provides:

> "A district court may transfer a case or a proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."

Mirroring that provision, Bankruptcy Rule 1014(a)(1) provides:

> If a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners and other entities as directed by the court, the case may be transferred to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.[5]

 The criteria to be employed in determining the "convenience of the parties" were set forth in *Commonwealth Oil, Refining Company, Inc.*, 596 F.2d at 1247 and still remain:

---

5. Even were it determined that the Debtor's principal place of business is Texas and therefore that this case was improperly put before this Court, pursuant to Bankruptcy Rule 1014(a)(2), this Court would still have the discretion to transfer the case to Texas in the interest of justice or for the convenience of the parties.

(1) The proximity of creditors of every kind to the Court;

(2) The proximity of the bankrupt (debtor) to the Court;

(3) The proximity of the witnesses necessary to to the administration of the estate;

(4) The location of the assets;

(5) The economic administration of the estate;

(6) The necessity for ancillary administration if bankruptcy should result.

In viewing the first of these criteria, it cannot be disputed that First Irving and USA are based in Texas. In addition, the debt owed USA is at least three times the amount of any other debt. The second largest creditor, Morgan, however, is based just blocks from this courthouse in New York City and has been present in order to assert its interest in keeping the case here and in order to demonstrate its willingness to negotiate with the Debtor in regard to financing.[6]

With respect to the second criterion, and given that venue under 28 U.S.C. § 1408 is initially sustained only through the movants' failure to meet their burden of proof, the Debtor is fairly proximate to both the courthouse here and the courthouse in Dallas. While Mrs. Turner has filed affidavits here, so has Mr. Prosser. He is day-to-day in charge and is stationed in Houston.

No such equivocation appears with respect to the fourth criterion. The vast bulk of the Debtor's assets, the 334 apartment units, are located in Irving, Texas. To be sure, Morgan holds cash and promissory notes from the Debtor's limited partners in New York. Seemingly, those notes are recourse obligations made payable to the Debtor. The Debtor has not shown, however, that all of those notes are fully collectible or collectible in New York. In any event, even if their face value is ascribed to them, they and the cash held by Morgan are dwarfed by the Apartments claimed by the Debtor to have a value ranging from $11.5 million to $14.7 million.

The same conclusion is reached with respect to the sixth criterion. If the case is converted to Chapter 7, ancillary administration would take place in Texas and not in New York.

With respect to the third and fifth criteria, proximity of witnesses necessary to estate administration and economic administration of the estate, it is clear that the location of the Debtor's principal asset, the Apartments, plays a pivotal role since it is determinations concerning the value and condition of the Apartments which are key to the ultimate administration of this estate. *Accord In re Old Delmar Corporation*, 45 B.R. 883, 884–85 (S.D.N.Y.1985); *Landmark Capital Company v. North Central Development Company (In re Landmark Capital Company)*, 20 B.R. 220, 224 (S.D.N.Y.1982); *Hadar Leasing International Co., Inc. v. D.H. Overmyer Telecasting Company, Inc. (In re Hadar Leasing International Co., Inc.)*, 14 B.R. 819, 820 (S.D.N.Y.1981); *In re Pavilion Place Associates*, No. 88 B 10530, (Bankr. S.D.N.Y. April 8, 1988); *In re Ofia Realty Corp.*, 74 B.R. 574, 577 (Bankr.S.D.N.Y. 1987).

That this case does indeed turn on those issues and will require extensive testimony from Texas witnesses is made clear by the affidavits filed by both parties, particularly the Debtor, during the course of these proceedings. When First Irving and USA filed their omnibus motion to vacate the automatic stay pursuant to 11 U.S.C. § 362(d) and change venue to Texas, the Debtor contended that they are oversecured creditors. It also contended that LBI had mismanaged the Apartments and that mismanagement was responsible for an occupancy rate of 62%. At the trial of the motion to lift stay and the turnover complaint, First Irving and USA put on appraisal evidence indicating that the value

---

6. To be sure, the proximity of equity holders, here the limited partners, is a factor in under this branch of the *Commonwealth Oil* test. *Commonwealth Oil Refining Co., Inc.*, 596 F.2d at 1248; *In re Island Club Marina, Ltd.*, 26 B.R. 505, 507 (Bankr.N.D.Ill.1983). But the concern for equity holders is less than the concern for creditors in a case such as this where the total debt so greatly exceeds the value attributed by the Debtor to its property.

of the Apartments is $13,700,000 and therefore that they were undersecured creditors. The testimony further revealed that the Apartments were not decreasing in value. After one day of a trial, that appeared to require three or four days, both sides entered into a settlement agreement pursuant to which the Debtor was to obtain bids to repair the Apartments. The only bid submitted, however, was for $3.2 million of which $1.8 million was allocated to bring the 334 units into compliance with the City of Irving Building Code. The settlement then fell apart. In response to the motion by First Irving and USA to restore their motion to the calendar, Betsy Lee Turner filed an affidavit stating that the $3.2 million bid was made by a reputable independent building contractor and alleging that the magnitude of the work necessary to bring the property into compliance with the City of Irving Building Code and the original plans and specifications is the clearest evidence of breaches of contract by the movants in selling the property to the Debtor. The Court granted the motion to restore, scheduling the venue motion ahead of other matters. The Debtor then filed a plan of reorganization providing for a cram down of the claims of First Irving and USA pursuant to 11 U.S.C. § 1129(b)(2) on the ground that they are secured only in an amount ranging from $10.5 million to $11.5 million. It reached that conclusion by deducting $3.2 million from the First Irving and USA appraisal of $13.7 million or from its own appraisal of $14,750,000.

Thus, judicial administration of this case will concern not merely appraising the property but in valuing it in light of whether extensive repairs are necessary and whether the Apartments comply with the City of Irving Building Code. This will occur primarily in assessing the Debtor's plan of reorganization. Section 1129(b)(2) permits cram down of a secured creditor by leaving it with its lien securing the allowed amount of its secured claim or providing it with deferred cash payments of at least the allowed amount of its claim and having a present value in the amount of its interest. Section 506(a) limits the allowed amount of a secured claim to the value of the collateral.

This question will also be crucial on the lift stay motion. Since it appears that relief under § 362(d)(1) could not be granted in light of the testimony of the appraiser introduced by First Irving and USA that the property is not decreasing in value, *see United States Association of Texas v. Timbers of Inwood Forest Associates, Ltd. (In re Timbers of Inwood Forest Associates, Ltd.),* —— U.S. ——, 108 S.Ct. 626, 629–30, 90 L.Ed.2d 740 (1988); *In re Saypol,* 31 B.R. 796, 800 (Bankr.S.D.N.Y.1983), and since retention of the property is obviously necessary to any reorganization of the Debtor, the question on that motion will be whether there is a likelihood of an effective reorganization within a reasonable time under § 362(d)(2).[7] *See Saypol,* 31 B.R. at 803. Thus, the valuation issue central·to the Debtor's plan is central to that motion.

On this record, it is virtually undisputed that the witnesses to that issue are in Texas. The First Irving and USA appraiser is from Texas. The Debtor's appraiser, whose report consists of 123 pages, is from Texas. The Debtor's architect, whose report contains a 13 page list of leaking buildings and other alleged defects, is from Texas. The builder allegedly responsible for these problems also is from Texas and it would appear that its construction personnel are from Texas.

7. Bankruptcy Code § 362(d)(1) & (d)(2) provides:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity interest in such property; and

(B) such property is not necessary to an effective reorganization.

In response, the Debtor contends that (a) courts often value property located far away from the courthouse (b) it plans to invest $700,000 to $800,000 to make immediate repairs and expects further contributions from limited partners to fund additional repairs in the future, (c) it will likely need new funding from Morgan and its limited partners which can be obtained more easily in New York, and (d) with trial having commenced here, it would be a waste to send the case to Texas where the bankruptcy courts are too clogged to permit it to make its case. Each of these positions lacks merit.

There is no doubt that courts can and do value property far from the courthouse. Such valuations are usually done on the basis of discounting future income. *In re Beker Industries, Corp.*, 58 B.R. 725 (Bankr.S.D.N.Y.1986). But it is quite another task to address a claim of structural damage and whether 334 apartments located some 1500 miles from the courthouse are in compliance with local building codes. The former requires the testimony of two appraisers assessing income, risk factors and industry trends. The latter requires testimony of local fact witnesses. Such local disputes should be decided locally. *In re Union Carbide Corporation Gas Plant Disaster at Bhopal, India in December, 1984*, 809 F.2d 195 (2d Cir.), *cert. denied sub nom. Union of India v. Union Carbide Corporation*, — U.S. —, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987). This was made clear in this case at argument when Debtor's counsel held up a piece of cardboard allegedly used as roofing material in order to demonstrate the Debtor's claim and contrasted it with a felt-wrapped piece of plywood which it is said that the architect's plans and City of Irving Building Code require.

That the Debtor plans to make an additional initial investment of some $700,000 to $800,000 to partially address the problem does not change the nature of this case. The valuation issue will still exist.

The Debtor's further contention that retention of the case is required because the funds it needs to finance the plan might be forthcoming from Morgan and the limited partners is unpersuasive. In investing in and in loaning money to a Texas limited partnership with a Texas building complex as its principal asset, those parties must have expected that their willingness to make further investments and loans would be based on concerns relating to the Texas economy and the prospects of the venture in Texas rather than in New York.

Nor does one day of trial having occurred here change the nature of this case. The particularly local issues now presented were hardly addressed during that one day of trial; indeed they largely emerged after its completion with the submission of the Turner affidavit of May 2, 1988. Judicial economy will be served by the transferee court's merely adopting the limited record such as it is and proceeding to the issue. There has been no proof of its inability to do that and to afford the hearings required by §§ 362(d) and 1129.

In sum and on balance, this is a case that, regardless of whether the Debtor is to reorganize or be liquidated, should be transferred to Texas. It is clear that the administration of the estate will concern local questions directly concerning the property and thus will be far from merely custodial in nature. *C.f. In re Boca Development Associates*, 18 B.R. at 654; *In re Marina Enterprises, Inc.*, 14 B.R. 327 (Bankr.S.D.Fla.1981) (Venue was proper in forum where the debtors maintained their principal offices and books and records rather than the forum where their "dormant, unimproved" real estate was located); *In re One-Eighty Investments, Ltd.*, 18 B.R. 725, 728 (N.D.Ill.1981) (location of assets not particularly important where operation of apartment building consisted of routine and uninvolved matters). Unlike in *In re International Filter Corporation*, 33 B.R. 952, 956–57 (Bankr.S.D.N.Y.1983) (if Debtor might be liquidated and most of its creditors reside elsewhere, venue should be transferred to the district in which the assets and most of the creditors are located), we need make no assessment of its reorganizational prospects on this motion. Under a reorganization scenario, the convenience of the witnesses, the economic ad-

ministration of the estate, the location of its principal assets, the balance of proximity of creditors and the interests of justice require transfer of this case to Texas. The same is true under a liquidation scenario.

The foregoing constitutes this Court's findings of fact and conclusions of law. The motion to transfer this bankruptcy case to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, must be and hereby is granted pursuant to 28 U.S.C. § 1412 and Rule 1014(a)(1) of the Rules of Bankruptcy Procedure and the clerk is directed to transmit the file to the clerk of the court. It is

SO ORDERED.