**In re VIENNA PARK PROPERTIES, a Limited Partnership, Debtor.**

**Bankruptcy No. 89–B–12967 (CB).**

United States Bankruptcy Court, S.D. New York.

Oct. 23, 1990.

S. Hodara, Lisa Beckerman–Stenlake, New York City, for Trust Bank Sav., FSB and United Postal Sav. Ass'n.

## DECISION ON MOTION TO TRANSFER VENUE

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

### STATEMENT OF FACTS

A. Background

On November 22, 1990, Vienna Park Properties, (the "Debtor"), filed a petition under chapter 11 of the United States Bankruptcy Code in the Southern District of New York.

Movants, United Postal Savings Association ("United Postal") and Trustbank Savings, F.S.B. ("Trustbank"), (collectively the "Secured Creditors"), seek an order transferring this case, pursuant to 28 U.S.C. Section 1408 and Bankruptcy Rule 1014(a)(2), alleging that venue improperly lies in the Southern District of New York. Alternatively, movants seek to transfer this case to the Eastern District of Virginia in the interest of justice or for the convenience of the parties pursuant to 28 U.S.C. Section 1412 and Bankruptcy Rule 1014(a)(1). The Debtor opposes transfer.

A trial on the Venue Motion was commenced on March 13, 1990 and continued on March 14, April 5 and concluded on April 25, 1990. Post petition memoranda of law were subsequently submitted by the parties.

1. *The Parties*

United Postal is the largest secured creditor and maintains its principal and sole place of business in St. Louis, Missouri. Trustbank is the second largest secured creditor with its principal place of business in the Northern Virginia area. In addition to United Postal and Trustbank, the other secured creditors are: two local taxing authorities, the Town of Vienna and the County of Fairfax, Virginia, respectively; and Vienna Park Associates ("Associates").

Glass & Eckstein, P.C. by James D. Glass, Andrew B. Eckstein, New York City, for debtor.

Frank, Bernstein, Conway & Goldman by Harvey Lebowitz, Jay Shulman, Baltimore, Md., and Strook & Strook & Lavan by Fred

Neither of the taxing authorities nor Associates have joined in this motion.

The Debtor is a New Jersey limited partnership with 53 limited partnerships. Of the 53 limited partners of the Debtor, 47 are located in New York or reside in New York and/or New Jersey (Tr. 3/13/90 at 31). The limited partnership was formed in or about June 1984 for the purpose of acquiring, owning and operating condominiums. The following are general partners in the partnership: Brookhill Capital Resources, Inc., ("Brookhill Capital"), Ronald B. Bruder, Douglas E. Nemens and Herbert N. Salis. The Debtor is affiliated with Brookhill Management Corporation ("Brookhill Management"), whose sole office is located in New York. Mr. Bruder, the President of Brookhill Capital and an individual general partner of the Debtor, and Messrs. Nemens and Salis, executive Vice Presidents of Brookhill Capital and individual general partners of the Debtor, reside in or near New York City and maintain their offices in New York.

Brookhill Capital, a New Jersey Corporation, is a multifaceted real estate company that maintains its principal place of business in New York (Tr. of 3/14/90 at 5). Brookhill Capital has the responsibility for managing the affairs of the partnership. In addition to managing the Debtor's property, Brookhill Capital and its affiliates own or act as general partner, operator and/or manager of in excess of thirty (30) other properties, including shopping centers, office buildings and residential complexes located in at least twenty (20) states.

Brookhill Management, a New York Corporation, is a company that has management agreements to manage approximately 25 properties in the country (Tr. of 3/14/90 at 6). Brookhill Management is currently serving as the primary managing agent for the property owned by the Debtor (Tr. of 3/14/90 at 9).

### 2. *Acquisition of the Property*

This is a single asset real estate bankruptcy case. On June 22, 1984, the Debtor purchased an apartment complex, the Vienna Park Apartments (the "Condominiums"), from Associates.

In order to acquire the Condominiums, on or about June 11, 1984, the Debtor entered into a Restated and Amended Agreement ("Purchase Agreement") under which it was to purchase the Condominiums from the Associates (Trial Exhibit 1). The Condominiums consist of a 300–unit complex located in Vienna, Virginia.

The Purchase Agreement provided for a purchase price of $18 million. The Condominiums are in a single complex which has been divided into two condominium purchase regimes.[1] In order to finance the acquisition of the Condominiums, Congressional Mortgage Corporation provided first priority deed of trust financing in the aggregate principal amount of $13.5 million, secured by 300 separate Deeds of Trust on each of the 300 units. The Deeds of Trust also granted an interest in the common areas of the condominium regimes. The Deeds of Trust secure 300 separate Deed of Trust Notes (the "Notes"). By virtue of the purchase of the Notes, United Postal is the holder of 162 of the 300 Notes and is the largest secured creditor. Trustbank is the holder of the remaining 138 Notes and is the second largest secured creditor. Trustbank has never been responsible for servicing the loans held by it but, rather, has delegated such responsibility to Sunbelt National Mortgage Corporation, an entity located in Dallas, Texas, which assumed responsibility for servicing the loans from its predecessor, an entity known as Wendover Funding, which is believed to have maintained its place of business in North Carolina (Tr.

---

**1.** The Purchase Agreement states:
"Seller intends to subject the property to two condominium regimes known as Vienna Park South Condominium consisting of 174 units Vienna Park South ... and Vienna Park North ... Condominium ... consisting of 126 condominium units ... by recording declara-

tions ... by-laws ... and condominium plats and plans ... for the Condominium Project in accordance with the provisions of the Virginia Condominium Act of 1974, as amended (the "Act") (Trial Exhibit 1 (Restated and Amended Purchase Agreement; Creditor Post–Trial Memo at 9)).

4/25/90 at 61–63; Trial Exhibit 34; "Bolger Deposition" at 19–20). Associates provided second priority purchase money financing in the principal amount of $2.5 million. This secondary financing did not require any payments during the 5–year maturity period and accrued interest at the rate of 3.652% per annum. The Purchase Agreement further provided for the establishment of Escrow Accounts (the "Escrow Accounts"), which, *inter alia*, were created to provide funds for operating deficits and debt service (Trial Exhibit 1, Section 12 at 8).[2] Suburban Bank and Trust Company which is now known as Sovran Bank ("Sovran"), located in Bethesda, Maryland became the escrow agent (Trial Exhibit 9).

## B. Managing Contracts

The Purchase Agreement permitted Associates to designate the entity to manage the Condominiums (Trial Exhibit 1, Section 14 at 9). Associates designated GLM Corporation ("GLM"), an affiliate of Associates' general partner, and pursuant to this designation GLM entered into a Management Agreement (the "Management Agreement"), with the Debtor, dated June 22, 1984 (Trial Exhibit 2). GLM is based in Washington, D.C. and was the sole property manager of the Condominiums from June 22, 1984 through June 22, 1989.

On or about June 22, 1989, Brookhill Management, the Debtor's affiliate, succeeded GLM as the principal manager of the property. Brookhill Management entered into a Sub–Management Agreement, dated June 16, 1989, with Grady Management, Inc., ("Grady") which provides for Grady, a fee-management company of residential and commercial property (Tr. 4/25/90 at 25),[3] to become the sub-managing agent.

### 1. *GLM Management Period*

Under the Purchase Agreement between the Debtor and Associates, GLM was designated to manage the Condominiums from June 22, 1984 through June 22, 1990 (Trial Exhibit 1, Section 14 at 9). Both the Purchase Agreement (Trial Exhibit 1, Section 14 at 9–12) and the Management Agreement (Trial Exhibit 2, Section 4 at 4–6) entitled the Debtor to receive detailed information from GLM concerning the operational and financial affairs of the Condominiums (Creditor Post–Trial Memo at 10). These Agreements provided, in detail, that the Debtor receive (i) monthly invoices detailing each and every receipt and disbursement made by GLM supported by copies of checks, vouchers, duplicate invoices and similar documentation; (ii) an itemization of all operating expenses incurred during each and every month; (iii) a monthly operating statement showing the income and expenses for the month and for year-to-date; (iv) copies of the invoices furnished to the escrow agent requesting draws from the Escrow Accounts for operating deficits; and (v) budgets each and every year (Trial Exhibit 2, Section 14 at 9–11; Creditor Post–Trial Memo at 10). The Debtor was also entitled to audit the financial records of GLM to the condominiums at any time (Trial Exhibit 2, Section 11 at 9; Creditor Post–Trial Memo at 10). Finally with respect to any problem essential for the safety, health and habitability of the Condominiums or occupants, the Management Agreement provided for a mechanism to have a designated neutral third party determine whether a problem existed and the manner in which the problem should be remedied (Trial Exhibit 1, Section 14 at 12; Trial Exhibit 2, Section 6 at 6–8; Creditor Post–Trial Memo at 11).

The Debtor was so dissatisfied with GLM's performance that it decided not to renew the contract when it was due to expire on June 22, 1989 (Debtor Post–Trial Memo at 11). In describing GLM's role as property manager, the Debtor distinguishes between GLM's role in the management of the Debtor's partnership

---

**2.** The parties to the Escrow Accounts, including the Debtor, assigned their interests in the Escrow Accounts to Congressional Mortgage Corporation as collateral to secure the Notes.

**3.** The term management for fee means that Grady does not have any interest in the property. Grady is hired as an agent to negotiate and execute contracts on behalf of the owner (Tr. of 4/25/90 at 25).

and the on-site management of the Condominiums during the GLM Management period. While the Debtor has conceded that GLM was the sole managing agent of the property during this period, they maintain that the primary and overall managerial functions with respect to the Condominiums remained with the Debtor's general partners in New York (Debtor Post–Trial Memo at 9–10).

In this vein, the Debtor contend that GLM (a) never performed the accounting functions for the Debtor, (b) took no role in reporting or accounting to the Debtor's limited partners, (c) did not prepare the Debtor's partnership tax returns; (d) never represented the Debtor in attempts to renew or renegotiate the Loans; and (g) never represented the Debtor in negotiations for the sale of the Condominiums (Debtor Post–Trial Memo at 9–10).

The Debtor has also conceded that the Condominiums were improperly managed during the 5–year period in which GLM was the sole property manager (Creditor Post–Trial Memo at 14; Trial Exhibit 25). In fact, the Debtor has various claims against GLM for the mismanagement of the Condominiums during the 5–year period which ended June 22, 1989 (*Id.*).

The Secured Creditors claim that the Debtor's general partner, Brookhill Capital, and affiliate, Brookhill Management, had virtually no role in making any managerial or financial decision with respect to any aspect of the business during the tenure of GLM's management (Creditor Post–Trial Memo at 11). For instance, during the 5–year period in which GLM drew from the Escrow Accounts, GLM did not supply, nor did the Debtor apparently request, detailed invoices and back-up in conjunction with said monthly withdrawals (Creditor Post–Trial Memo at 13; Trial Exhibit 7 at 44–73; Tr. of 3/14/90 at 44; 54; Tr. of 4/5/90 at 59–62, 67–70, 100–101). In June, 1989, pursuant to an engagement by the Debtor, the accounting firm of Reznick, Fedder & Silverman, of Bethesda, Maryland, went to the offices of GLM in an attempt to reconcile the Escrow Accounts (Trial Exhibit 3). The accountants found a system which maintained few, if any, controls over the withdrawal of money from these accounts. (Trial Exhibit 24; Creditor Post–Trial Memo at 13).

Reconciliation of the Escrow Accounts will require an audit of all income and expenses during the 5–year period (Creditor Post–Trial Memo at 13). As noted above, both the Purchase Agreement (Trial Exhibit 2, Section 4 at 4–6) and the Management Agreement entitled the Debtor to receive detailed financial information concerning the financial affairs of the Condominiums (Creditor Post–Trial Memo at 10). The Secured Creditors have consistently maintained that although the Debtor could have insisted on this procedure during the course of GLM's management, GLM did not provide this information to the Debtor, and the Debtor did not request this information at any time. (Creditor Post–Trial Memo at 14).

Additionally, the Secured Creditors point out that the Debtor made infrequent inspections of the property and seldom responded to GLM's complaints about the property (Creditor Post–Trial Memo at 11–12). For instance, during the 5 years of GLM's management, there were four documented physical inspections of the property by Brookhill officers (*Id.*). The inspections were between an average of about 1 year apart (Trial Exhibits 13, 15, 16, 17; Creditor Post–Trial Memo at 11). In each instance, a Brookhill officer, by letter or orally, complained about aspects of the condition of the property. This was usually followed by a written response by GLM (Ex. 14, 16, 18). There is no documentation of any follow up by a Brookhill officer after the written responses (Creditor Post–Trial Memo at 12).

## 2. *Brookhill/Grady Management Period*

As noted earlier, a transition in the management of the Condominiums occurred immediately following the expiration of GLM's contract. Brookhill Management was appointed as principal manager of the Condominiums and Grady, in turn, was the local on-site managing agent.

(Kramer Aff. at 4; Debtor Post–Trial Memo at 12, 16). As sub-managing agent, Grady contracted with Brookhill Management, the Debtor's primary managing agent (Tr. of 4/5/90 at 27; Trial Exhibit 6 (Sub–Management Agreement)), for a period of one year with an option to renew after that year. Grady was responsible for reporting to Brookhill Management (Debtor Post–Trial Memo at 12). Grady was employed exclusively to rent, lease, operate, and manage the property (Trial Exhibit 6, Sections 1–2; Tr. of 3/14/90 at 78–79). Grady's responsibilities further included preparation and submission of monthly operating statements to the Debtor and an annual budget for the approval by the owner, Vienna Park Properties (Trial Exhibit 6 at Sections f, g and h).

Mr. Wudske testified that from the outset of Grady's retention, there was a great deal of communication between Grady and Brookhill Management (Tr. of 4/25/90 at 40–43), both orally and in writing, to discuss and agree upon tasks to be undertaken (Tr. of 4/25/90 at 41; Debtor Post–Trial Memo at 13). Grady initially communicated with Brookhill Management several times a week and sometimes as often as several times daily (Tr. of 4/25/90 at 42, 43; Debtor Post–Trial Memo at 13). As time passed, Grady received authorization to undertake projects and the frequency and intensity of Grady's communication with Brookhill Management diminished somewhat (Id.) Nevertheless, Grady's communications with Brookhill Management remain active (Tr. of 4/25/90 at 43; Debtor Post–Trial Memo at 13). Representatives of Brookhill Management have visited the Condominiums to examine the property and the local competition (Tr. of 4/25/90 at 43–44; Kramer Aff. at 5–6).

The Sub–Management Agreement provided that Grady could make recommendations to the Debtor regarding the renovation and maintenance of the properties. Grady's representatives and Brookhill Management's representatives have reviewed and discussed a comprehensive rehabilitation project for the Condominiums (Tr. of 4/25/90 at 44–47). Grady formulated and proposed an advertising strategy to Brookhill Management (Creditor Post–Trial Memo at 15; Debtor Post–Trial Memo at 14; Tr. of 4/25/90 at 14). The Debtor approved the advertising plan (Id.). The Debtor contends that Grady also reported to Brookhill Management relative to advertising alternatives and the results thereof (Tr. of 4/25/90 at 31–32; Debtor Post–Trial Memo at 14). In addition, Grady recommended the enactment of a rental rebate program to Brookhill Management, who approved it, to increase the number of prospective tenants visiting the property, including rebates and referral fees (Tr. of 4/25/90 -at 38; Creditor Post–Trial Memo at 15; Debtor Post Trial Memo at 14).

Shortly after its retention, Grady performed its standard independent physical inspections of the Condominiums (Tr. of 4/5/90 at 42–44; Trial Exhibit 10; Debtor Post–Trial Memo at 13). In addition, Grady determined what repairs and improvements were immediately necessary (Creditor Post–Trial Memo at 15) and created a plan to improve the condition of the Condominiums, the training and performance of the personnel at the Condominiums, and to increase occupancy (Tr. of 4/5/90 at 140–44; Creditor Post–Trial memo at 15). Grady also recommended that the kitchens in the Condominiums be refurbished (Tr. of 4/25/90 at 38). The record reflects that Brookhill Management expressly objected to this expenditure (Id.).

With respect to vendors for the performance of, maintenance of and improvements to the Condominiums, Grady continued to utilize some of the vendors which had previously serviced the Condominiums and introduced some new vendors (Tr. of 4/25/90 at 15). Grady conducted comparative pricing in connection with the utilization of certain new vendors for the Condominiums, and Brookhill Management approved of Grady's recommendations (Id.)

The parties are also in dispute over Grady's role with respect to determining the rental rates for the Condominiums (Creditor Post–Trial Memo at 15; Debtor Post–Trial Memo at 14). The Secured Creditors contend that "at all times until the bankruptcy filing, Grady determined what rents

should be charged as vacancies were filled" (Tr. of 4/5/90 at 140–44; Tr. of 4/25/90 at 5–6; Creditor Post–Trial memo at 15). However, Mr. Wudske testified that as a matter of standard course, Grady independently conducts market surveys to assist it in evaluating appropriate rental rates (Tr. of 4/25/90 at 5). He further testified that Grady has made recommendations to Brookhill Management for modifications of the rental rates for the Condominiums (Tr. of 4/25/90 at 6).

Under the Sub–Management Agreement, Grady was also responsible for preparing operational budgets and financial projections (Tr. of 4/25/90 at 31). Grady prepared and provided Brookhill Management with a proposed budget for the operation of the Condominiums for the latter of 1989 (Tr. of 4/25/90 at 6–10; Trial Exhibit 27). Grady also prepared operating statements and annual reports that were distributed to the investors of the partnership. Brookhill Management approved Grady's operational budget (Tr. of 4/5/90 at 36) without modification.

## C. Location of Books and Records

The records pertaining to the acquisition of the property are located in New York, at the office of Mr. Nemens, an individual general partner of the Debtor. In addition, the Debtor maintains all organizational and long-term books and records in New York at the offices of the Debtor's general partners in New York (Debtor Post–Trial Memo at 5; Tr. of 3/14/90 at 52–54, 74–76).

The records pertaining to the operations of the property during GLM's tenure are located at the offices of GLM in Washington, D.C.

All the records of GLM concerning the total sources and uses of funds are located in Washington, D.C. The individuals responsible for these records (both currently and during the GLM management period) are also located in the Washington, D.C. area (Creditor Post–Trial Memo at 14; Tr.

of 3/14/90 at 36). Similarly, the records of the escrow agent, Sovran, are located in the trust division offices in its headquarters in Bethesda, Maryland, a suburb of Washington, D.C. (*Id.*). It is possible that litigation may ensue against GLM over the management of the Escrow Accounts (*Id.*). In the event litigation does ensue between the Debtor and GLM, some of the individuals who may be relevant witnesses reside in or near the Washington, D.C. area.[4]

The Debtor concedes that because Grady handles the day-to-day operations of the Condominiums, the books and records relative to the current day-to-day operations of the Condominiums are located in Virginia, at the office of the sub-managing agent (Tr. of 3/14/90 at 53).

In addition, Grady maintains approximately three or four operating bank accounts for the Debtor in Virginia, in suburban Washington, D.C. and Maryland (Tr. of 4/5/90 at 70–74; Creditor Post–Trial Memo at 16; Debtor Post–Trial Memo at 16–17). Additionally, there is an operating checking account, an operating money market account, a security deposit escrow account for tenant security deposits and another escrow account which has been used to deposit any excess cash flow (Tr. of 4/5/90 at 75; Tr. of 3/14/90 at 55; Creditor Post–Trial Memo at 16, Debtor Post–Trial Memo at 16–17).

## D. Location of the Parties

Although the Debtor and its limited and general partners reside in or near this District, most of the remaining parties reside within the vicinity of the property, Virginia. In essence, there are five secured creditors in this case: the two Secured Creditors, United Postal and Trustbank (having first liens on the Debtor's real property), see *infra* at 321–22, Associates (an affiliate of GLM, which has a second lien on the property), and the two Virginia real property taxing authorities, the Town

---

**4.** Five of the employees which were on GLM's staff during GLM's tenure as sole manager of the property are currently on staff with Grady, the on-site sub-managing agent of the condo-

miniums and partial successor to GLM. These individuals are likely to be witnesses in the possible litigation between the Debtor and GLM. (Tr. of 4/5/90 at 40).

of Vienna and Fairfax County, Virginia (Creditor Post–Trial Memo at 5; Tr. of 3/14/90 at 66). Four of the creditors, in excess of $11 million (approximately 60% in amount of all) are located in the Washington, D.C. metropolitan area, and the only other creditor, United Postal, holding all the remaining claims, has requested a transfer of venue (*Id.*). There are no creditors in New York.

The Debtor has a multitude of unsecured creditors, with claims for security deposits, who reside in the Virginia vicinity (Trial Exhibit 12).

The vendors, suppliers, maintenance and repair people, and utility companies are all located in the vicinity of the property, Virginia, Washington, D.C., or Maryland (Tr. of 3/14/90 at 65–66).

## DISCUSSION

### A. Proper Venue

■ Venue is governed by 28 U.S.C. § 1408 which provides that a case may be commenced in the district in which the Debtor has its domicile, residence, principal place of business or principal asset for the 180 days immediately prior to the commencement of the case.[5] The movant in a venue motion carries the burden of proof which must be met by the preponderance of the evidence standard. *In re Landmark Capital Corp.*, 19 B.R. 342, 344 (Bankr.S.D.N.Y.), *aff'd. sub nom., Landmark Capital Co. v. North Central Development Co.*, 20 B.R. 220 (S.D.N.Y.1982).

■ The proper venue of an action commenced by a partnership is difficult to ascertain, given the natural difficulty in determining the residence or domicile of a partnership. The only meaningful test for venue of a partnership, therefore, is where it has its principal place of business (the

"Nerve Center Test") or its principal assets in the United States (the "Bulk of Activity Test"). *In re Bell Tower Associates, Ltd.*, 86 B.R. 795, 799 (Bankr.S.D.N.Y.1988); *In re Holiday Towers, Inc.*, 18 B.R. 183, 186 (Bankr.S.D.Ohio 1982). Since the test is in the alternative, venue may properly lie in more than one district.

■ The determination as to the location of the principal place of business of a partnership rests on a determination of fact. *In re Commonwealth Oil Refining Co., Inc.*, 596 F.2d 1239, 1245 (5th Cir. 1979), *cert. denied* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980); *In re Landmark Capital Co., supra*, 19 B.R. at 347. The place where the Debtor makes its major business decisions constitutes the Debtor's principal place of business regardless of where the Debtor's assets are located. *In re Landmark Capital Co.*, 19 B.R. at 347. When a Debtor, like in this case, is a single asset partnership with a slew of general and limited partners, the location of the partners is not determinative of the venue of the Debtor, *In re Nantucket Apartments Associates*, 80 B.R. 154 (Bankr.E.D.Mo.1987), but may be influential in determining where the Debtor's major managerial decisions are made. *See In re Bell Tower Associates, Ltd.*, 86 B.R. at 799; *In re Garden Manor Associates, L.P.*, 99 B.R. 551, 553 (Bankr.S.D.N.Y. 1988).

■ It is not uncommon, however, for a single asset partnership to bifurcate its major managerial duties and the duties of the on-site management of its property. *See In re Landmark Capital Co.*, 19 B.R. at 345.

In the case at bar, the Debtor is a New Jersey limited partnership, with 53 limited partners. Of the 53 limited partners, 47

---

**5.** 28 U.S.C. Section 1408 states in pertinent part: Except as provided in Section 1410 of this title, a case under title 11 may be commenced in the district court for the district

 (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and days immediately preceding such commencement, or

for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

 (2) in which there is pendency a case under title 11 concerning such person's affiliate, general partner, or partnership. 28 U.S.C. Section 1408(1), (2).

are located in New York or reside in New York or New Jersey. The Debtor's sole major asset, the Condominiums, is located in Virginia. The Debtor's general partners reside in or near New York City and maintain their offices in New York. The records pertaining to the acquisition of the property and all of the organizational and long-term books and records are located in New York, at the offices of the Debtor's general partners. The records pertaining to the on-site day-to-day management of the properties, however, are located in the Washington, D.C. area. Grady, the present on-site management, also maintains several operating bank accounts from the Debtor in Virginia, suburban Washington, D.C. and in Maryland. The Debtor does, however, maintain a significant portion of its bank accounts at two (2) New York banking institutions.

The Secured Creditors are of the view that venue does not properly lie in this district, where the petition was filed, because the Debtor's principal place of business is in Virginia, where both the on-site manager of the property and the property are located. They reach this conclusion by virtue of the fact, as they view it, that during GLM's tenure and up until the present time, the Debtor has been a passive owner delegating all major managerial and financial functions to the local on-site managers, whether it was GLM or Grady. The Secured Creditors posit that the central nerve of this Debtor has been at all times and continues to be in Virginia.

The Debtor maintains that although Brookhill Management looks to Grady for recommendations relative to the operation of the Condominiums in the most efficacious manner, it does not necessarily rubber stamp all of Grady's recommendations (Debtor Post–Trial Memo at 14).

The Debtor contends that because Brookhill Management had already reached the same results with respect to the budget prior to receiving Grady's budget and, subsequently, learned that the conclusions of Grady and Brookhill Management were the same, there was no need for discussion with respect to the budget (Tr. 4/25/90 at 10; Tr. of 4/5/90 at 36–37; Debtor's Post–Trial Memo at 13). Similarly, after telephone conversations with Brookhill Management, a proposed budget for the 1990 operation of the condominiums was provided by Grady (Tr. of 4/25/90 at 10–11).

The Secured Creditors disagree; they contend that Grady instituted the programs, *see infra* at 325, without Brookhill Management's involvement (Creditor Post–Trial Memo at 1, 16, 18). The Secured Creditors further claim that in each instance, although Grady communicated what it proposed to do to a representative of "Brookhill Management," each proposal was orally approved without modification (Creditor Post–Trial Memo at 16). In their Post–Trial Memorandum, the Secured Creditors have specifically noted that Brookhill Management has not modified any proposal or questioned any budget item (Tr. of 4/5/90 at 47, 81–84, 143–44; Tr. of 4/25/90 at 10–11, 14–17, 54; Creditor Post–Trial Memo at 16).

It is clear from the testimony elicited and evidence presented at trial, that the Secured Creditors' argument boils down to a claim that the Debtor essentially mismanaged the property by authorizing the activities undertaken by GLM, and now by Grady, without much change.[6]

The Debtor has consistently described Grady as a very competent local on-site manager (Debtor Post–Trial Memo at 11–12) whose contractual responsibilities are to make suggestions and recommendations

---

**6.** Notwithstanding the Debtor's standing objection at the trial on the basis of relevancy, this Court permitted a great deal of evidence and testimony to be admitted into evidence, relative to the prior management of the Debtor's 300–apartment–unit Condominium complex during the period from the Debtor's acquisition of the Condominiums on June 22, 1984 through June 22, 1989, which ended in more than one hundred fifty (150) days prior to the commencement of the Debtor's chapter 11 case on November 22, 1980 (Debtor Post–Trial Memo at 3–4). However, in determining the proper venue of this case, the Court shall consider only facts and events relevant to the 180 days prior to the filing of the petition.

for approval by the Debtor (Trial Exhibit 6 (Sub–Management Agreement); Tr. of 4/25/90 at 31). If the Debtor is satisfied, it approves Grady's recommendations (*Id.*). In fact, at the trial, Mr. Wudske testified "that he discusses with Brookhill Management all the policy decisions that are to be made ... that they work it out and basically if Brookhill Management does not object to what he does then it will be implemented" (Tr. of 4/5/90 at 35).

The Debtor also maintains that Grady has played no role in either the formulation of the plan of reorganization or the sale of the property (Tr. of 4/25/90 at 30, 52; Debtor Post–Trial Memo at 17). The Debtor contends that it is responsible for the formulation and the implementation of the plan of reorganization and for the sale (Debtor Post–Trial Memo at 17). The Debtor admits to likely mismanagement by GLM inasmuch as it states that litigation against GLM is in the near future. This litigation, however, would be for GLM's on-site day-to-day management of the property, not for major management decisions. The Secured Creditors failed to show that the Debtor's general partners did not make the long-term decisions concerning the Debtor's business. Even if the Debtor followed to the letter the suggestions made by either GLM or Grady, it was the Debtor's business judgment to do so. The decisions not to change anything proposed by the on-site management are major management decisions. While the Secured Creditors question the Debtor's prudence or business judgment in making managerial decisions, which was probably the reason for filing for bankruptcy protection, they have not shown that the decisions did not emanate from New York. *See In re Garden Manor*, 99 B.R. 551 (Bankr.S.D.N.Y. 1988); *In re Holiday Towers Inc.*, 18 B.R. 183 (Bankr.S.D.Ohio 1982). In fact, most businesses find themselves in bankruptcy because of poor business judgment by management. But, decisions made by in-competent management are still made by them and no one else.

### B. Transfer of Venue for the Convenience of the Parties

■ Since venue properly lies in this district, the case can only be transferred based on the interest of justice or the convenience of the parties' test pursuant to section 1412 of Title 28 of the United States Code. That section provides that:

A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

28 U.S.C. § 1412.[7] As in motions challenging proper venue, the moving party in a motion to transfer venue pursuant to section 1412 bears the burden of proof which must be satisfied by the preponderance of the evidence. *In re Landmark Capital Co.*, 19 B.R. at 344.

■ The bankruptcy court must exercise its discretion when determining whether to transfer venue for the convenience of the parties. *Commonwealth v. Commonwealth Oil Refining Co., Inc., (In re Commonwealth Oil Refining Co.),* 596 F.2d 1239, 1247 (5th Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980). The courts have called for caution in exercising these discretionary powers especially where, as here, the action was commenced in a district with proper venue. *In re Commonwealth Oil Refining Co., Inc.,* 596 F.2d at 1239; *In re Bankers Trust,* 403 F.2d 16, 23 (7th Cir.1968).

Extensive case law, particularly that from this District, has set forth the following criteria to weigh when determining whether to transfer venue pursuant to section 1412:

1. the proximity of creditors of every kind to the court; .

2. the proximity of the bankrupt (Debtor) to the Court;

---

7. Bankruptcy Rule 1014(a)(1) also provides:
 If a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners and other entities as directed by the court, the case may be transferred to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.

3. the proximity of witnesses necessary to the administration of the estate;

4. the location of the assets;

5. the economic administration of the estate; and

6. the necessity for ancillary administration in the event of liquidation.

*In re Commonwealth Oil Refinery Co.,* 596 F.2d at 1247. Of course, these criteria should be applied on a case-by-case basis. *Id.; In re Pavilion Place Associates,* 88 B.R. 32, 35 (Bankr.S.D.N.Y.1988).

### 1. *The Proximity of the Creditors*

 The Debtor does not have any creditors in New York. The Debtor's unsecured creditors include a rather large group of the Debtor's tenants holding *de minimis* contingent unsecured claims for rental security deposits held in escrow accounts by the Debtor. These claims, however, do not become due and owing until such time that their leases expire without default. The remaining unsecured creditors are vendors, suppliers, maintenance and repair people and utility companies—all located in close proximity to the property. As for the Debtor's known secured creditors, four of the five known secured creditors are located in the Washington, D.C. vicinity. The remaining secured creditor, which is also the largest secured creditor, is located in Missouri but has joined in the motion to transfer venue.

### 2. *Proximity of Witnesses and the Efficient Administration of the Estate*

 If the relationship between the Secured Creditors and the Debtor is any indication of what the future holds, this case will involve continuous controversies and confrontations between these parties. The Debtor and Secured Creditors have had an acrimonious relationship from the commencement of the case. So far, there has been issue as to whether certain rental proceeds constitute cash collateral and

whether the Debtor may use certain funds for payment of attorneys' fees. These matters involve Virginia law. In fact, this Court's decision and reconsideration on the cash collateral matter turned on Virginia's treatment of assignment of rent clauses.[8] Where it is clear that a case involves questions of local law, venue should be transferred to or near the local site. *See In re Bell Tower Associates, Ltd.,* 86 B.R. 795, 803 (Bankr.S.D.N.Y.1988). Clearly, the mere fact that the Debtor has met with the Secured Creditors' opposition at every corner is not sufficient to transfer venue. If that were true, then every secured creditor of a single asset partnership in bankruptcy could win its motion to change venue simply by engaging in battle with the Debtor. In this case, however, the issues have been genuine and are truly of local concern. The economic administration of the estate appears to call for a Virginia bankruptcy court, which is versed in Virginia law, to hear and determine these types of issues.

Additionally, valuation will probably be an issue to contend with at some point in these proceedings. A determination of valuation may call for witnesses from the Virginia area.

The single most compelling fact in this case calling for the transfer of venue, however, is the likelihood of litigation by the Debtor against GLM. The Debtor has admitted to a likelihood of litigation against GLM for mismanagement. This litigation, if it comes to fruition, will require numerous witnesses from the Washington, D.C. area. The ability to subpoena these witnesses to a hearing before this Court would be severely limited because of the one hundred (100) mile limitation of the subpoena powers.[9] GLM's officers, the former GLM property manager and GLM's former controller are among the list of witnesses necessary to this litigation. Grady, as successor on-site manager, will be involved in this litigation since they know first-hand the

---

**8.** *In re Vienna Park Properties,* 112 B.R. 597 (Bankr.S.D.N.Y.1990).

**9.** (1) ... a subpoena requiring the attendance of a witness at a hearing on trial may be served at any place within the district, or at any place

without the district that is within 100 miles of the place of the hearing or trial specified in the subpoena.... Fed.R.Civ.P. Rule 45 (incorporated by Bankruptcy Rule 9016).

condition of the property when it was taken over by the Debtor. Grady, however, has appeared and testified in this matter and voiced a willingness to testify in the future. Additionally, all of the records of GLM are located in GLM's offices in close proximity to the property. The escrow agent of the Escrow Accounts is located in Maryland. The escrow agent will be a necessary witness regarding the reconciliation of the Escrow Accounts. Although the litigation is only a likelihood, the Court must consider not only the present state of the bankruptcy proceeding but must also attempt to look at the entire case and the kinds of problems it will confront.

■■■ The most important factor to weigh, by far, is the promotion of the economic and efficient administration of the estate. *In re Commonwealth Oil Refining Co.*, 596 F.2d at 1247; *In re Pavilion Place Associates*, 88 B.R. at 35. In light of the possible protracted litigation against GLM, the economic and efficient administration of the estate would most likely be served if the case were transferred to Virginia.

The Debtor claims that since its nerve center is in New York and its general partners are in the New York area, the transfer of this case to Virginia would work to the detriment of the Debtor and its general partners. A transfer would cause the Debtor's general partners to travel to Virginia to attend the hearings. The Debtor fears that if the general partners were taken away from New York, any ongoing negotiations between the general partners and the Debtor's banks or other interested lenders would be jeopardized. This Court, however, cannot envision the kinds of problems that would face the Debtor in the event the case were transferred to Virginia. Basically, the convenience of the Debtor's general partners is at issue here. The Debtor's general partners can nevertheless conduct negotiations with prospective lenders by telephone or they can just work around their traveling to Virginia. Additionally, Virginia is not so far away that traveling there for a short hearing is absurd.

3. *The Proximity of the Bankrupt (Debtor) to the Court; the Location of the Assets; and the Necessity for Ancillary Administration in the Event of Liquidation*

The proximity of the Debtor and the location of the assets' factors do not carry much weight either in favor of transfer of venue or against it.

The Debtor's assets are not centrally located. The Debtor's major asset, the Condominiums, several of the Debtor's books and records, the operating bank accounts and Escrow Accounts are located in the Virginia vicinity. On the other hand, the records pertaining to the acquisition of the property and all organizational and long-term books and records are located in New York. Again, however, the location of the Debtor's assets pertaining to the litigation against GLM are in the Virginia vicinity.

The Debtor's general partners are in the New York vicinity, but its presence is also in Virginia where the property and books and records and bank accounts are located.

Should liquidation occur, Virginia would be the best location for this case since the overwhelming majority of the Debtor's creditors, both secured and unsecured, are in close proximity to Virginia.

C. Other Related Cases Pending in this District

The Debtor is seeking to add yet another factor to the enumerated factors discussed above, by seeking to retain venue in this district because of certain chapter 11 cases pending in this district which are related to the Debtor's case. This claim is premised on Title 28 of the United States Code, § 1408, which provides that venue is proper in the district: "(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership." 28 U.S.C. § 1408 (1988). While admitting that it is "not technically an affiliate" as defined within the statutory language of § 101(2) of the Code, the Debtor claims to be an affiliate of other related cases (*Hobe Sound Properties, Shreveport Properties* and *Sunset Center Properties* )

pending in this district by virtue of the fact that all of these debtors share a common general partner, Brookhill Capital, and a common agent, Brookhill Management. This argument, however, goes to where proper venue of a case lies. The Court has already determined that pursuant to 28 U.S.C. § 1408, the Debtor's chapter 11 case was properly filed in this district.

Normally, the analysis would end here and the case would be transferred to Virginia. However, this Court finds that another factor must be considered under the "efficient administration of the case" factor. This Court has decided numerous issues and matters in this case and finds that its imprint on this case is so pervasive that transfer to another bankruptcy judge would not be in keeping with judicial economy. This is especially true because of my opinion, rendered *sua sponte* and signed and decided simultaneously with this decision, reversing an earlier decision. A bankruptcy judge should not be placed in a position of overruling a decision of another bankruptcy judge. If the case is to be overruled, the proper appellate procedures should be followed.

This Court assigns great weight to the 100-mile limitation for witnesses and, under different circumstances, venue would be transferred to Virginia. However, when weighed against the judicial economy, the witnesses' availability issue must fail. The witnesses' issue can be resolved by the use of Rules 45(d) and 32(a)(3)(B).

Accordingly, the motion for transfer of venue is denied.

Settle Order in conformance with this Decision on five (5) days notice.