596 F.2d 1239
 5 Bankr.Ct.Dec. 480, Bankr. L. Rep. P 67,224
 In the Matter of COMMONWEALTH OIL REFINING CO., INC., Bankrupt.
COMMONWEALTH OF PUERTO RICO and Puerto Rico Water Resources
Authority, Appellants Cross-Appellees,
v.
COMMONWEALTH OIL REFINING COMPANY, INC., et al., Appellees
Cross-Appellants.
 No. 78-3019.
 United States Court of Appeals,
Fifth Circuit.
 June 13, 1979.
Rehearing and Rehearing En Banc Denied Aug. 9, 1979.
 
 Benjamin R. Ramon, Hato Rey, P. R., Bracewell & Patterson, Kenneth R. Wynne, John T. Arnold, Houston, Tex., Cadwalader, Wickersham & Taft, New York City, for appellants cross-appellees.
 Sheinfeld, Maley & Kay, Robert C. Maley, Jr., Houston, Tex., Rochelle, King & Balzersen, Dallas, Tex., for Commonwealth Oil Refining.
 James G. Ulmer, Houston, Tex., George J. Wade, New York City, J. Burleson Smith, R. Laurence Macon, David C. Spoor, San Antonio, Tex., Will M. Kahn, New York City, for Tesoro.
 Appeals from the United States District Court for the Western District of Texas.
 Before COLEMAN, GODBOLD and INGRAHAM, Circuit Judges.
 GODBOLD, Circuit Judge:
 
 
 1
 Commonwealth Oil Refining Company (CORCO), filed a Chapter XI petition for reorganization in the San Antonio Division of the Western District of Texas on March 2, 1978.[1] On March 6 the Government of Puerto Rico and the Puerto Rico Water Resources Authority (PRWRA) objected to venue and moved to transfer the proceedings to the United States District Court for the District of Puerto Rico. Both the bankruptcy court and the district court denied the motions to transfer.
 
 I. Proceedings below
 
 2
 Venue for a Chapter XI case is proper in either the district where the debtor has "had its principal place of business or its principal assets for the preceding (six) months or for a longer portion thereof than in any other district." Fed.R.Bankr.P. 116(a)(2). All parties agree that Puerto Rico is where CORCO's principal assets are located. There is no agreement on the location of CORCO's principal place of business. CORCO contends that its principal place of business is San Antonio. Puerto Rico and PRWRA argue that it is Puerto Rico. The bankruptcy court concluded that San Antonio is CORCO's principal place of business and that venue is properly laid there. It refused to transfer the case. The district court reversed the findings that the principal place of business is San Antonio and that venue is proper in San Antonio, but nevertheless it retained jurisdiction pursuant to Bankruptcy Rule 116(b), which allows the court to retain a case "in the interest of justice and for the convenience of the parties" even though venue was improperly laid. Fed.R.Bankr.P. 116(b)(2). The discretion to retain such a case, however, must be used with caution and in few cases. In re S.O.S. Sheet Metal Co., 297 F.2d 32 (CA2, 1961). The bankruptcy court, on the other hand, having concluded that venue was proper in San Antonio, considered the motion to transfer under Bankruptcy Rule 116(b)(2), which allows the court to transfer a case to another district if "the interest of justice and . . . the convenience of the parties" would be better served by administering the case in the other district. Again, the court should exercise its power to transfer cautiously, In re Bankers Trust, 403 F.2d 16, 23 n.10 (CA7, 1968), and the party moving for the transfer must show by a preponderance of the evidence that the case should be transferred, In re Fairfield Puerto Rico, Inc., 333 F.Supp. 1187, 1189 (D.Del.1971).
 
 
 3
 We reverse the district court's finding that CORCO's principal place of business is Puerto Rico and agree with the bankruptcy court that its principal place of business is San Antonio. We also conclude that the bankruptcy court did not misuse its discretion in refusing to transfer the case to Puerto Rico. We reach the same conclusion as the district court, that the case should remain in San Antonio, but we follow the reasoning of the bankruptcy court.
 
 
 4
 The location of a debtor's principal place of business is a question of fact. It is therefore necessary to set out in some detail the corporate structure of CORCO and its operations. We will then determine the legal definition of principal place of business. Finally, we consider whether the case should have been transferred under Rule 116(b)(1).
 
 II. CORCO
 
 5
 CORCO, incorporated under the laws of Puerto Rico, is in the business of operating a petroleum refinery and petrochemical facilities.[2] Its physical plant is located in Puerto Rico.[3] Prior to 1971 CORCO's executive offices were also located there. From 1971 to 1975 the offices were in New York City. In 1975, Tesoro Petroleum Corporation, headquartered in San Antonio, successfully tendered for a controlling share of CORCO's common stock.[4] In contemplation of a merger of the two companies, Tesoro had CORCO's executive offices moved to San Antonio in 1976. The merger plans have since been shelved, but CORCO's executive offices have remained in San Antonio.[5]
 
 
 6
 Although all of CORCO's production facilities are located in Puerto Rico, almost all of its executive officers live and office in San Antonio. The management of CORCO is divided into six departments: Planning and Economics, Operations, Marine Transportation, Refined Products Marketing, Petrochemicals Marketing, and Environmental Affairs. Each department is headed by a vice president. The vice presidents report to the executive vice president who in turn is responsible to the president and chief executive officer. Both the president and executive vice president work out of San Antonio. Of the six department heads, four live in San Antonio; one, vice president of Refined Products Marketing, lives in McLean, Virginia; and one, senior vice president of Operations, lives in Puerto Rico. There are two other vice presidents, the general counsel and secretary and the comptroller and treasurer; both live in San Antonio. Directly below the vice president level of management is a group of general managers and directors. Both the director of Personnel and director of Public Affairs live in San Antonio. There are three general managers Joint Ventures, Operations and Supplies, and Refined Products Liaison. All three live in San Antonio.
 
 
 7
 An analysis of the jobs performed by CORCO's management reveals that the company's physical operations are controlled from San Antonio. This is best seen by an explanation of the process through which CORCO purchases feedstocks for its facilities and ultimately sells its products to customers.
 
 
 8
 A starting point in describing the process is the CORCO Operating Team. The function of the team is to prepare what is called the Operating Plan. The plan outlines how the refining and petrochemical facilities should operate for the upcoming 60 or 90 day period, the amount of each product that should be produced, and the facility that should produce it. Because of constant changes in the market the plan must continually be updated. This is accomplished at the weekly or semi-weekly meetings of the team. The team consists of the heads of all the departments or their designated representatives.
 
 
 9
 Input into the plan necessarily comes from all departments. The general manager for Supplies and Refined Products Liaison reports on the availability of raw materials and their prices. Marine Transportation must find available means for transporting the raw materials to Puerto Rico and some of the finished product to off-island customers. Both the Petrochemical and Refined Products Marketing departments estimate the quantities of products that can be sold. The Operations department estimates the quantities of the different products that can be produced. The Planning and Economics department is charged with assimilating all of these factors, supplies, transportation, production and sales, and coming up with a plan that will result in the most profitable mix of products and quantities.
 
 
 10
 The bankruptcy court found that the Operating Plan is not a statement of general policy but rather a detailed production schedule. We agree. The people in charge of operations at the refinery are not authorized to substantially deviate from the production schedule in the plan. Because of the upstream and downstream effect of any substantial deviation on the rest of CORCO's operation, changes must be cleared through San Antonio and the appropriate changes made in the transportation needs and marketing aspects of CORCO's business. There is, of course, some delegated authority to make adjustments in production. The refinery is given latitude to cope with emergencies, and in some instances the plan delegates options for the Puerto Rico personnel to choose from.[6] This limited delegation of authority, however, does not alter the basic fact that the purchase of feedstocks, the refining process, and the transportation of both is directed from San Antonio.[7]
 
 
 11
 The financial heart of CORCO is located in San Antonio.[8] The comptroller and treasurer works out of San Antonio. He is charged with the normal responsibilities of a comptroller and treasurer: managing bank accounts, payment of taxes and preparation of financial reports. In addition, all of CORCO's expenses, except for those directly related to the refinery in Puerto Rico, are paid out of the San Antonio office. The weekly $20,000,000 bill for feedstocks is paid from San Antonio. The payroll for the refinery workers is prepared in Puerto Rico.
 
 
 12
 CORCO's financing is run by people who work in San Antonio. Although many of CORCO's loan agreements are negotiated and executed in New York, the people responsible for the negotiations work out of San Antonio. The only significant task relating to the financial management of CORCO that is performed in Puerto Rico is the maintenance of the corporate books, the corporate audit, and the billing of customers. CORCO maintains its original books in Puerto Rico as required by Puerto Rican law.[9] CORCO's tax returns, however, are prepared in San Antonio.
 
 
 13
 In addition to the location of CORCO's physical plant in Puerto Rico, most of its products are sold to customers located in Puerto Rico. CORCO's sales team is divided into two departments, refined products and petrochemicals. CORCO's largest refined products customer is PRWRA, which purchased over 9,000,000 barrels of oil in 1977 for an approximate price of $132,700,000.[10] An employee stationed in Puerto Rico, the general manager of marketing,[11] services CORCO's account with PRWRA. This general manager, however, does not have the authority to commit CORCO to delivery of residual fuel oil to PRWRA. After PRWRA has informed CORCO's general manager that it wants to purchase fuel, the vice-president for Refined Products Marketing is informed, who then checks with the operating team to determine the availability of the product. Based on the information the vice-president receives, he either approves or disapproves of the sale. Only this vice-president is authorized to bind CORCO in a sales agreement.
 
 
 14
 CORCO sold $198,000,000 worth of gasoline to other customers in Puerto Rico during 1977. The contracts for these sales are negotiated in the home offices of companies that sell gasoline in Puerto Rico. Of the five gasoline contracts, four were negotiated and executed in the mainland and only one in Puerto Rico. CORCO's Virginia office is responsible for negotiating the contracts and servicing the accounts.
 
 
 15
 The sale of refined products to mainland customers resulted in revenues of $190,000,000 in 1977. Most of these sales were made to customers on the Northeast coast of the United States. People working out of CORCO's Virginia office are responsible for these sales. No sales are actually consummated, however, until the Virginia office has checked with San Antonio on the availability of the products.
 
 
 16
 The petrochemical marketing department is stationed in San Antonio. Over 80% Of the petrochemicals produced by CORCO are either sold to CORCO's joint venturers located in Puerto Rico or to CORCO's refinery for refining into gasoline.[12] Most of the remaining production is sold to mainland customers. For sales of $110,000,000 in 1977, all but $9,000,000 were sold off-island. The contracts for the petrochemical sales were negotiated either at the home office of the purchasers or in San Antonio.
 
 
 17
 This overview of CORCO's operation reveals that production is centered in Puerto Rico and that management is centered in San Antonio. CORCO's supplies come from off-island sources, but a majority of CORCO's production is sold to customers located in Puerto Rico.[13] With this factual basis we consider the location of CORCO's principal place of business.
 
 III. Venue in Chapter XI proceedings
 
 18
 A history of the Chapter XI venue provision is essential to an understanding of the meaning of principal place of business. Prior to the adoption of the current Chapter XI venue provision in 1973, Section 2(a)(1) of the Bankruptcy Act, 11 U.S.C. § 11(a)(1), limited venue for Chapter XI cases to the corporation's principal place of business.[14] Chapter X of the Bankruptcy Act, on the other hand allowed for venue in both the district where the corporation maintains its principal place of business or its principal assets.[15] Rule 116(a)(2) changed the Chapter XI venue provision to conform to Chapter X's standards.[16] The change is significant for at least two reasons. First, it sheds some doubt on the validity of old case law construing Chapter XI's prior venue statute. Second, the change indicates an intent to expand the districts where a Chapter XI debtor may file by appreciating the fact that a debtor's principal place of business is not necessarily at the same location as its principal assets.
 
 
 19
 Prior to the adoption of Rule 116, the courts were divided on the question whether a debtor's principal place of business is located in the district where the debtor maintains its general executive offices or in the district where the debtor operates its production facilities. Compare Dryden v. Ranger Refining & Pipe Line Co., 280 F. 257 (CA5), Cert. denied, 260 U.S. 726, 43 S.Ct. 89, 67 L.Ed. 483 (1922), and Continental Coal Corp. v. Roszelle Bros., 242 F. 243 (CA6, 1917), With Shearin v. Cortez Oil Co., 92 F.2d 855 (CA5, 1937), and Burdick v. Dillon, 144 F. 737 (CA1, 1906). Although all courts agreed that the location of a debtor's principal place of business is a question of fact, either production or management facts were emphasized, depending on the circuit's preference.
 
 
 20
 This circuit has to some extent been inconsistent in its treatment of this issue. In Dryden, the debtor maintained its general office in Kansas City, Missouri. The debtor was in the business of producing, refining, and selling oil and gas. Most of its refineries and producing wells were located in the Northern District of Texas. Most of the debtor's contracts were made and filled in the Northern District. Money owed the debtor on these contracts was also collected in the Northern District. On these facts the court concluded that the debtor's principal place of business was located in the Northern District. In the later case, Shearin, this court expressed a preference for locating a debtor's principal place of business in the district where the debtor manages its affairs. In Shearin, the debtor's oil wells and the place where it delivered its product was in the Southern District of Texas. The place from where the debtor managed its business, however, was in the Northern District of Texas. The court chose the Northern District as the principal place of business.
 
 
 21
 Dryden and Shearin are inconsistent in the language they use in reaching their conclusion on the location of the debtor's principal place of business, but they are reconcilable on their individual facts. Dryden ruled out the situs of production as a litmus test for locating a corporation's principal place of business. The court recognized that in an appropriate case the place "from which general supervision of (the debtor's) business is exercised, may be properly held to be the principal place of business." 280 F. at 263. Shearin was an appropriate case. All of the debtor's business was managed from its offices in the Northern District. The emphasis in Shearin was on the place where the debtor deals with the public.
 
 
 22
 Since the adoption of Rule 116 it is no longer necessary to choose between the places of production and management. The emphasis of earlier decisions on the location of the debtor's production facilities is no longer appropriate because the location of the debtor's principal assets is now an independent basis of venue. Although relevant to an inquiry into a debtor's principal place of business, the change in Rule 116 has greatly diminished its significance. The case law developed under Chapter X's venue provision, which has always contained Rule 116's alternative basis for venue, is now relevant to venue under Chapter XI. We agree with the court's conclusion in In re Portex Oil Co., 30 F.Supp. 138 (D.Or.1939), Aff'd sub nom. Clark Bros. Co. v. Portex Oil Co., 113 F.2d 45 (CA9, 1940), that
 
 
 23
 A distinction must have been intended between the two points where jurisdiction could be founded, although often the principal assets will be at the principal place of business. The intent must have been to permit a corporation which habitually transacted its corporate business at some point to bring proceedings there.
 
 
 24
 (T)he distinction noted in the statute permits administration if the petition is filed in the district where the principal place of business is located, for the very purpose of allowing the internal administration of a company to be settled at the point where those interested in it chose primarily to conduct its business.
 
 
 25
 Id. at 140.
 
 
 26
 Allowing venue in the district where a debtor manages its business is particularly appropriate in both Chapter X and XI cases. A corporate arrangement or reorganization is primarily a financial proceeding. The debtor is maintained as a going enterprise and its finances are put back in order. See Note, 52 N.Y.U.L.Rev. 362, 362 n.5 (1977). Where the corporation transacts its corporate business is a logical place for venue in such proceedings.
 
 
 27
 Our review of CORCO's corporate structure demonstrates that it manages most of its affairs from San Antonio. The feedstocks for its facilities are purchased by people working out of the San Antonio office. The transportation of the raw product to Puerto Rico is arranged from San Antonio. The operation of the refineries is directed from San Antonio. The sale of its refined products is managed from Virginia, and the sale of petrochemicals is managed from San Antonio. The people who deal with the Department of Energy and other federal agencies are stationed in San Antonio. On these facts, we conclude that the bankruptcy court was not clearly erroneous in locating CORCO's principal place of business in San Antonio.
 
 
 28
 The district court relied exclusively on this court's opinion in Dryden for reversing the bankruptcy court's conclusion that CORCO's principal place of business is in San Antonio. The court stated "that the facts compel the conclusion that application of the tests set forth in Dryden . . . fix the debtor's principal place of business in Puerto Rico." In a footnote the court listed the following facts in support of its conclusion:
 
 
 29
 all of its assets are there; all of its production takes place there; 95% Of its employees live there; 70% Of its refined products sales and 88% Of its petrochemical sales are made in Puerto Rico to entities physically located on the island (some of the entities are headquartered elsewhere and the contracts for the sales may be negotiated off-island); invoices are prepared and distributed from Puerto Rico; all original records are kept in Puerto Rico by virtue of Puerto Rican law; the debtor's data processing center is located in Puerto Rico; its audits are conducted in Puerto Rico; stockholders' and directors' meetings are held on the island; most of CORCO's current litigation, which is extensive with regard to both the number of suits and the dollar amounts involved, is going on in Puerto Rican courts (the next most utilized forum is New York); the majority in number of its creditors are in Puerto Rico; and Puerto Rico is its place of incorporation.
 
 
 30
 As already indicated, the location of a debtor's assets is not particularly significant since the adoption of Rule 116. The location of employees is, of course, tied to the location of assets. Many more workers are needed to run a refinery than to manage one. The district court mentions the physical location of CORCO's customers but does not give sufficient consideration to where the sales are negotiated and who in the corporate structure is charged with sales responsibility. Where the invoices are prepared is significant, but where CORCO pays its bills is of equal importance. The office of the comptroller and treasurer is located in San Antonio. The other factors mentioned by the district court, location of records, where audits are performed, directors' and stockholders' meetings are held, and the location of CORCO's current litigation are all relevant factors, but the inquiry should not have stopped there. Although the district court's citation to Dryden is somewhat cryptic, the lower court must have proceeded on the understanding that the location of a debtor's principal assets is its principal place of business. Dicta in Dryden might support such an assumption, but adoption of Rule 116 has vitiated whatever validity that dicta once had. Moreover, the Dryden court eschewed any attempt to set a firm rule and recognized that general supervision of a corporation's business can constitute a corporation's principal place of business. The district court should have considered that management of all aspects of CORCO's business emanates from San Antonio.
 
 
 31
 For the district court to reverse the bankruptcy court's conclusion that San Antonio is CORCO's principal place of business it had to conclude that the bankruptcy court's finding was clearly erroneous. Guarantee Acceptance Corp. v. Fidelity Mortgage Investors, 544 F.2d 449, 459 (CA10, 1976); Clark Bros. Co. v. Portex Oil Co., 113 F.2d 45, 47 (CA9, 1940). Our review of the facts and the relevant legal principles convinces us that the bankruptcy court's finding was not clearly erroneous.[17]
 
 IV. Transfer of venue
 
 32
 Even though venue in San Antonio was proper, it was still within the bankruptcy court's discretion to transfer the case to Puerto Rico. Fed.R.Bankr.P. 116(b)(1). The court declined to do so, and we conclude that there was no abuse of discretion. In re Tonkawa Refining Co., 502 F.2d 1341, 1343 (CA10, 1974).[18] The two general considerations the rule instructs the court to take into account are the convenience of the parties and the interest of justice.
 
 
 33
 Under the heading of convenience of the parties the bankruptcy court listed six factors:
 
 
 34
 (1) The proximity of creditors of every kind to the Court;
 
 
 35
 (2) The proximity of the bankrupt (debtor) to the Court;
 
 
 36
 (3) The proximity of the witnesses necessary to the administration of the estate;
 
 
 37
 (4) The location of the assets;
 
 
 38
 (5) The economic administration of the estate;
 
 
 39
 (6) The necessity for ancillary administration if bankruptcy should result.
 
 
 40
 None of the parties has questioned the propriety of these considerations, nor have they suggested any additional ones.
 
 
 41
 The bankruptcy court correctly concluded that the most important consideration is whether the requested transfer would promote the economic and efficient administration of the estate. On the efficiency side, San Antonio is clearly the favored district. The heart of a Chapter XI proceeding is working up a financial plan of arrangement acceptable to all relevant parties. The people charged with this responsibility in CORCO's management are all located in San Antonio. The bankruptcy court also found that the debtor's estate could be administered more economically in San Antonio. We cannot conclude that the bankruptcy court's finding was clearly erroneous.
 
 
 42
 The next group of considerations concern the proximity to the court of the creditors (and stockholders), the debtor, and necessary witnesses. By far the largest group of creditors numerically is located in Puerto Rico. On the other hand, the creditors with the largest claims have either urged retention of the proceeding in San Antonio or are located in San Antonio. The bankruptcy court decided to give more importance to the location and desires of the creditors holding the largest claims. We think this was inappropriate. To confirm a plan of arrangement under Chapter XI, it must be accepted by both a majority of creditors and by creditors holding a majority in amount claimed against the debtor. 11 U.S.C. § 762. Both number and size are of equal significance in gaining acceptance of a plan and should be of equal significance in considering the convenience of the creditors. Tesoro Petroleum, located in San Antonio, owns 37.6% Of CORCO's common stock. This makes San Antonio the area with the largest number of stockholders. Only 1.62% Of CORCO's shareholders are residents of Puerto Rico. On balance, the proximity of creditors and stockholders favors San Antonio.
 
 
 43
 The proximity of the debtor is evident. The concern is with the corporation's employees who must appear in court, not with the employees who are on the production line. CORCO's management is in San Antonio. This also answers the concern with the availability of witnesses. Most of the witnesses who must appear in court are stationed in San Antonio.
 
 
 44
 The next set of factors is the location of books, records and assets. Although most of CORCO's original books and records are in Puerto Rico, instant access through CORCO's computer system is available in San Antonio. The fact that the original set is maintained in Puerto Rico, therefore, is of little significance in weighing the relative convenience of the two forums. CORCO's assets are in Puerto Rico. This is of little importance in a Chapter XI proceeding where the goal is financial rehabilitation, not liquidation. See In re Banker's Trust, 403 F.2d 16, 23-24 (CA7, 1968).[19]
 
 
 45
 Finally, the bankruptcy court considered the need for ancillary administration in the event that liquidation occurs. As the court stated in In re Fairfield Puerto Rico, Inc., supra at 1191, "(a)nticipation of the failure of the Chapter XI proceeding is an illogical basis upon which to predicate a transfer."[20]
 
 
 46
 In addition to considering the convenience of the parties, Rule 116(b)(1) also instructs the court to account for the interest of justice. The main concern that this implicates is the importance of CORCO to the welfare and economic stability of Puerto Rico and its people. Because CORCO is a major supplier of petroleum products to Puerto Rico, both the economy and the people of Puerto Rico are vitally concerned with the outcome of the Chapter XI proceeding. The government contends that the overwhelming concern of Puerto Rico with the continued operations of CORCO require a transfer of this case to Puerto Rico. We disagree. Without belittling in the least the extent of Puerto Rico's interest in CORCO, that interest is served by maintaining CORCO as a functioning refinery. This can best be accomplished in San Antonio. The troubles of CORCO are financial. The people who can solve those problems for CORCO are in San Antonio. The bankruptcy court found, and we cannot say it is clearly erroneous, that it will be less disruptive to the continued operation of CORCO if this case is retained in San Antonio.V. Conclusion
 
 
 47
 We conclude that CORCO's principal place of business is San Antonio. The bankruptcy court could have nevertheless transferred the case in its discretion to Puerto Rico. It was not an abuse of discretion to refuse to do so.
 
 
 48
 Thus we conclude that the bankruptcy court must be affirmed. Our ultimate conclusion is the same as that reached by the district court, though arrived at by a different route.
 
 
 49
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Eleven subsidiaries of CORCO filed reorganization petitions in the same court at the same time
 
 
 [2]
 Most of CORCO's petrochemical facilities are operated as joint ventures. For purposes of this opinion, it is not necessary to explain the legal relationships between the joint ventures and CORCO
 
 
 [3]
 The refinery and petrochemical facilities are valued at $545,000,000. The replacement cost of the facilities is estimated at one billion dollars
 
 
 [4]
 Tesoro owns 36.7% Of CORCO's common stock
 
 
 [5]
 Rule 116(a)(2) is concerned with the location of the debtor's principal place of business only for the six months preceding the bankruptcy filing. The prior locations of CORCO's executive headquarters, therefore, is of no relevance to the issue in this case. Nor is it of any significance that CORCO moved its offices to San Antonio at the request of Tesoro. CORCO's offices are in San Antonio and have been there for the relevant period under Rule 116(a) (2)
 
 
 [6]
 Appellants make much of the fact that the actual production of various products has often failed to meet the schedule laid out in the plan. They infer from the deviations that the refinery personnel have substantial authority to change the operating plan. The evidence is to the contrary. CORCO's general manager of operations explained that a significant portion of the deviations resulted from San Antonio decisions to shut down certain producing units for necessary maintenance
 
 
 [7]
 The evidence indicates that it is not unusual in the petroleum industry to control the refining process from offices geographically distant from the physical plant
 
 
 [8]
 Since the filing of the Chapter XI petition the bank group providing post-petition financing has exerted substantial control over the financial workings of CORCO. Money received by CORCO from its sales is paid into a special account controlled by the lending banks
 
 
 [9]
 From a computer terminal in San Antonio, CORCO's officers have immediate access to its records
 
 
 [10]
 The bankruptcy court opinion lists the value of the sales at $182,000,000. The court was referring to the estimated sales projections for 1978
 
 
 [11]
 The use of the title general manager for corporate officers of CORCO is confusing. The general managers stationed in San Antonio are heads of departments. The general manager who services the PRWRA account is not a department head
 
 
 [12]
 The record is silent on who or where decisions are made concerning sales of petrochemicals to joint venturers or to CORCO's refinery
 
 
 [13]
 For example approximately 52% Of the gasoline produced by CORCO is sold for use in Puerto Rico; 90% Of its aviation fuel; 44% Of its middle distillate; 70% Of its residual fuel; and 38% Of its aromatics
 
 
 [14]
 Section 2(a)(1) provides in relevant part:
 The courts of the United States hereinbefore defined as courts of bankruptcy are . . . hereby invested . . . with such jurisdiction at law or in equity as will enable them to . . .
 (1) Adjudge persons bankrupt who have had their principal place of business, resided, or had their domicile within their respective territorial jurisdictions for the preceding six months, or for a longer portion of the preceding six months than in any other jurisdiction . . . .
 Although the statute is couched in terms of jurisdiction, prior to passage of Rule 116 it was interpreted as a venue provision. See Bass v. Hutchins, 417 F.2d 692, 694-95 (CA5, 1969). It was, therefore, within the power of the Supreme Court to promulgate a Bankruptcy Rule altering § 2(a)(1)'s venue provision. See 28 U.S.C. § 2075; Note, 52 N.Y.U.L.Rev. 362, 367 n.34 (1977).
 
 
 [15]
 11 U.S.C. § 528. The statute provides that
 If no bankruptcy proceeding is pending, an original petition may be filed with the court in whose territorial jurisdiction the corporation has had its principal place of business or its principal assets for the preceding six months or for a longer portion of the preceding six months than in any other jurisdiction.
 Id.
 
 
 [16]
 See Advisory Committee's Note to Rule 116(a). Rule 116 is made applicable to Chapter XI through Rule 11-13(a)(1). The venue provision for Chapter X is contained in Rule 10-114. It continues to allow venue at either the debtor's principal place of business or where its principal assets are located
 
 
 [17]
 The government of Puerto Rico relies heavily on Anniston Soil Pipe Co. v. Central Foundry Co., 216 F.Supp. 473 (N.D.Ala.1963). There, the district court concluded that for purposes of diversity jurisdiction, 28 U.S.C. § 1332(c), a corporation's principal place of business is the place where a corporation has its physical assets, not its executive offices. We intimate no view on the correctness of the Anniston decision. Rather, we conclude that it is irrelevant. The diversity statute was amended in 1958 to give corporations dual citizenship; in addition to the traditional citizenship in the state of incorporation, a corporation would also be considered a citizen of the state where it has its principal place of business. The purpose of the amendment was to reduce the availability of diversity jurisdiction. S.Rep. No. 1830, 85th Cong., 2d Sess. (1958), Reprinted in U.S.Code Cong. & Admin.News, 1958, pp. 3099, 3100. The adoption of Rule 116, on the other hand, was intended to expand venue choices for bankruptcy proceedings. Moreover, one of the purposes of diversity jurisdiction is to protect nonresidents from any possible prejudice they might encounter in local courts. Bank of the United States v. Deveaux, 9 U.S. (5 Cranch) 61, 87, 3 L.Ed. 38, 45 (1809). See generally Friendly, The Historic Basis of the Diversity Jurisdiction, 41 Harv.L.Rev. 453 (1928). A court fixing of a corporation's principal place of business would naturally try to implement this policy. No similar concern informs locating a corporation's principal place of business for bankruptcy proceedings. The policy concerns guiding each choice have little or nothing in common. 1 J. Moore, Federal Practice P 0.77 (3.-4.), (2d ed. 1978). The Anniston decision is not persuasive in this context
 
 
 [18]
 There is no need to consider whether the district court abused its discretion in retaining the case after it concluded that venue in San Antonio was improper, because of our conclusion that venue was proper in San Antonio
 
 
 [19]
 The location of the debtor's assets would be an extremely significant consideration in a liquidation proceeding
 
 
 [20]
 The government of Puerto Rico argues that the case should be transferred because of the extensive litigation between CORCO and other entities in Puerto Rico where Spanish civil law applies. Much of that litigation will not be in the bankruptcy court and will proceed in the appropriate court in Puerto Rico. The litigation involving Spanish civil law in the bankruptcy court could probably be handled more conveniently in Puerto Rico. By itself, however, that is insufficient reason to transfer the case