## In re EAGLE POINTE LIMITED DIVIDEND HOUSING ASSOCIATION LIMITED PARTNERSHIP, Debtor.

### No. 06–30695.

United States Bankruptcy Court,
N.D. Indiana,
South Bend Division.

Sept. 6, 2006.

---

James E. Carlberg, Bose, McKinney and Evans LLP, Indianapolis, IN, for Debtor.

### ORDER ON MOTION OF TCF NATIONAL BANK TO CHANGE VENUE

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

TCF National Bank ("TCF") filed its Motion of TCF National Bank to Change Venue on August 4, 2006, together with a memorandum of law in support of that motion. On August 22, 2006, Eagle Pointe Limited Dividend Housing Association Limited Partnership ("Eagle Pointe") filed its Debtor's Objection to Motion to Transfer Venue. An evidentiary hearing on the motion and the objection was held on August 23, 2006. TCF appeared by counsel Judith Greenstone Miller; the debtor appeared by counsel James E. Carlberg; the United States Trustee appeared by Assistant United States Trustee Alexander L. Edgar. Evidentiary submissions were completed on August 23, 2006; however, in order to accommodate the transportation arrangements made by TCF's counsel and its witness, final arguments were held telephonically on August 24, 2006, by telephonic bridge connection among the Court, and Attorneys Miller, Carlberg and Edgar. The final arguments were transcribed by a court reporter in the Court's chambers.

TCF's motion is based on two premises. The first is a somewhat half-hearted assertion that venue of Eagle Pointe's case in the United States Bankruptcy Court for the Northern District of Indiana, South Bend Division, is improper under 28 U.S.C. § 1408. Alternatively, TCF argues that venue of this Chapter 11 case should be transferred to the United States Bankruptcy Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1412 and Fed.R.Bankr.P. 1014(a)(1).

28 U.S.C. § 1408 states:

**§ 1408. Venue of cases under title 11**
Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

Sub-paragraph (2) of this statute has no applicability to this case.

In *Peachtree Lane Associates, Limited,* 150 F.3d 788 (7th Cir.1998), the United States Court of Appeals for the Seventh Circuit stated the standard for determination of proper venue under 28 U.S.C. § 1408's provision that venue is proper in a district in which the "principal place of business in the United States . . . of the entity that is the subject of such case [has] been located for the one hundred eighty days immediately preceding [the commencement of the case]".[1]

■ The *Peachtree* Court adopted the analysis of the United States Court of Appeals for the Fifth Circuit in *In re Commonwealth Oil Refining Co.,* 596 F.2d 1239 (5th Cir.1979) *cert. denied,* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980). The principal analysis is stated as follows:

The most comprehensive treatment we have found of the issue presented here is the Fifth Circuit's discussion in *In re Commonwealth Oil Ref. Co.,* 596 F.2d 1239 (5th Cir.1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980). That case addressed a Chapter 11 venue provision that preceded § 1408, which only became effective in 1984, but it too provided for venue in the judicial district "where the debtor has 'had its principal place of business or its principal assets for the preceding [six]

---

**1.** *Peachtree* involves a somewhat aberrant context concerning the venue issue which it determines. The case does not involve a direct motion under Fed.R.Bankr.P. 1014. Rather, the appellants in *Peachtree* indirectly challenged a judgment entered against them on an adversary complaint which Peachtree had filed in the bankruptcy court in which its Chapter 11 case had been filed. Although not expressly stated in the opinion, it is to be assumed that the venue issue had been raised in the adversary proceeding, presumably pursuant to Fed.R.Bankr.P. 7012(b)/Fed.R.Civ.P.

12(b)(3). As stated in footnote 2 of the opinion (150 F.3d at 792), the bankruptcy judge had considered and denied the appellants' motion to transfer the adversary proceeding to the Southern District of Texas, apparently pursuant to 28 U.S.C. § 1412; however, the appellants did not pursue that decision in their appeal. Thus, the decision in *Peachtree* relates to the propriety of venue under 28 U.S.C. § 1408, and the determination in that case is at best *dicta* with respect to issues under 28 U.S.C. § 1412 and Fed.R.Bankr.P. 1014(a)(1).

88

months or for a longer portion thereof than in any other district.'" *Id.* at 1241 (quoting former Bankr.R. 116(a)(2)). As in this case, the parties in Commonwealth Oil agreed that the debtor's principal assets were in Puerto Rico, where its physical plant was located. The debate between them focused on whether the debtor's principal place of business also was there, or whether it instead was in San Antonio, where the company maintained its executive offices and managed the Puerto Rico refining and petrochemical operations. *Id.* at 1241–44. In choosing between these two locales, the Fifth Circuit first reviewed the history of Chapter 11's venue provision in order to aid its understanding of the phrase "principal place of business":

Prior to the adoption of the current Chapter XI venue provision in 1973, Section 2(a)(1) of the Bankruptcy Act, 11 U.S.C. § 11(a)(1), limited venue for Chapter XI cases to the corporation's principal place of business. Chapter X of the Bankruptcy Act, on the other hand allowed for venue in both the district where the corporation maintains its principal place of business or its principal assets. Rule 116(a)(2) changed the Chapter XI venue provision to conform to Chapter X's standards. The change is significant for at least two reasons. First, it sheds some doubt on the validity of old case law construing Chapter XI's prior venue statute. Second, the change indicates an intent to expand the districts where a Chapter XI debtor may file by appreciating the fact that a debtor's principal place of business is not necessarily at the same location as its principal assets.

*Id.* at 1244–45 (footnotes omitted). The court observed that given these expanded venue options, "it is no longer necessary to choose between the places of production and management." *Id.* at 1245. Although the location of a debtor's production facilities is still relevant to the principal place of business inquiry, it is less significant than before "because the location of the debtor's principal assets is now an independent basis of venue." *Id.* In the end, although the principal place of business inquiry is primarily a factual one on which the bankruptcy court must be given considerable latitude, the Fifth Circuit found that it is likely the place where general operations are supervised. *Id.* at 1246–47. As such, the Fifth Circuit concluded that the bankruptcy court did not clearly err in finding that Commonwealth Oil's principal place of business was in San Antonio, not Puerto Rico. *Id.* at 1247.

Like a number of bankruptcy and district courts, we find *Commonwealth Oil's* discussion of the issue persuasive. *See Peachtree*, 206 B.R. at 920–21 (collecting decisions that have followed *Commonwealth Oil* in finding that an entity's principal place of business is the place where its major business decisions are made); *see also, e.g., In re Vienna Park Properties*, 120 B.R. at 327–29; *In re Sundance Corp.*, 84 B.R. 699, 700–01 (Bankr.D.Mont.1988); *In re Landmark Capital Co.*, 19 B.R. 342, 347 (Bankr. S.D.N.Y.), *aff'd*, 20 B.R. 220 (S.D.N.Y. 1982). We are in agreement with the Fifth Circuit that the "most important, consequential, or influential" place where a corporation or partnership does its business is likely to be the place where its management decisions are made. *Soliman*, 506 U.S. at 174, 113 S.Ct. 701, 121 L.Ed.2d 634. This focus on the location of the entity's primary decisionmakers is particularly appropriate, we think, in a reorganization case like this one, as such proceedings generally will involve the financial management of the debtor, rather than its day-

today operations. *Commonwealth Oil,* 596 F.2d at 1246; *see also Capitol Motor Courts v. Le Blanc Corp.,* 201 F.2d 356, 359 (2d Cir.), *cert. denied,* 345 U.S. 957, 73 S.Ct. 940, 97 L.Ed. 1378 (1953). As the bankruptcy judge aptly observed in this case: When a single asset real estate entity files a petition under chapter 11, the case is not likely to be about renegotiating the individual lease or deciding to increase rent $25.00 a month. The typical chapter 11 case for a single asset real estate entity is about raising new capital, renegotiating loan terms, or, if that cannot be done, attempting to "cram down" a plan on the secured creditors, or selling the asset. In determining where venue is proper in such a case, courts therefore look to where those persons who will make those key decisions are located.

*In re Peachtree Lane Assoc.,* 198 B.R. at 282; *see also In re Great Lakes Hotel Assoc.,* 154 B.R. at 672 n. 3; *In re Garden Manor Assoc.,* 99 B.R. 551, 554–55 (Bankr.S.D.N.Y.1988). Judge Barliant recognized that there may be exceptions to this general rule, but he found that this particular single-asset Chapter 11 proceeding was no different from the typical case he had described. *Peachtree Lane Assoc.,* 198 B.R. at 283. The major business decisions in this case, according to the court's undisputed factual findings, were made by Kemper personnel in Chicago or Long Grove, Illinois. Given those findings, it was not clearly erroneous for the bankruptcy court then to conclude that Peachtree's principal place of business during the venue period was in the Northern District of Illinois.

150 F.3d at 794–796. The analytical framework adopted by the Seventh Circuit from the Fifth Circuit has commonly been described as the "nerve center" analysis. Under this formulation, the critical focus of § 1408 is the location at which supervisory/management decisions on behalf of the debtor are actually made.

In the instant case, it is beyond question that the "nerve center" of the Eagle Pointe's operations is in the Northern District of Indiana, particularly in Mishawaka, Indiana. The evidence established that the debtor is a single-asset entity, its single-asset being a 144–unit "affordable housing" apartment building in Washtenaw County, Michigan, in close proximity to the City of Ann Arbor, Michigan. The development is, as its name would suggest, a limited dividend housing association, the members of which are comprised of a general partner and a limited partner. The general partner, Eagle Pointe Apartments LLC, is organized under the laws of the State of Indiana, and is comprised of three members: Larry Swank, Lance Swank and Washtenaw Affordable Housing, a non-governmental entity. The limited partner is a financing entity known as Boston Capital, which has its principal place of business in Boston, Massachusetts, and has a 99% equity stake in the housing unit. The evidentiary record establishes that the building facility is managed by Sterling Management Ltd. The debtor Eagle Pointe has a management agreement with Sterling Management Ltd., which the testimony of Larry Swank established was negotiated in Mishawaka, Indiana among Sterling, Larry Swank as a representative of Eagle Pointe Apartments LLC, and Boston Capital. The testimony and the documentary evidence establishes that the controlling documents with respect to the structure of Eagle Pointe and its interrelationship with Eagle Pointe Apartments LLC all provide that control of any critical decisions relating to Eagle Pointe's operation is centered in the general partner Eagle Pointe LLC, and that decisions on behalf of the general

partner are made by Larry Swank and/or Lance Swank from their business enterprise location in Mishawaka, Indiana. Although Wastenaw Affordable Housing is a member of the general partner, the testimony established that this entity has taken no active role in management decisions regarding Eagle Pointe. The evidence further established that Boston Capital, as a limited partner, has taken no role in day-to-day decisions affecting Eagle Pointe. The record established that while Boston Capital has the potential to replace the general partner, as of the date of the hearing, no action has been undertaken by Boston Capital to do so. There is no evidence that Boston Capital might exercise its limited partnership rights to replace the general partner the evidence is that Boston Capital *could* do so—again, essentially an irrelevant factor in relation to TCF's motion. The evidence established that Larry Swank and Lance Swank approve the final budget of Eagle Pointe; that the decision to cease making payments on the obligation to TCF was made by Larry Swank and Lance Swank, again operating from their business locus in Mishawaka, Indiana; that all financing decisions are made by the general partner of Eagle Pointe, which again only involves decision-making authority of Larry Swank and/or Lance Swank. The evidence also established that changes regarding rental rates to be charged by the apartment facility are done by Larry Swank alone, as a partner in the general partner (Eagle Pointe Apartments LLC). In short, the evidence established that although circumstances *might* arise to divest the general partner of control, the circumstances at the time of the hearing are that the general partner is in control and that there are no imminent prospects that control will be divested from the general partner.

Certain documents submitted into evidence by TCF contain declarations that the principal place of business of Eagle Pointe is in Michigan, and that its resident agent's address is an address in Michigan. The evidence established, however, that these declarations were required for the purpose of operation of an apartment facility in the State of Michigan, and that these designations have nothing to do with the situs of the "nerve center" of Eagle Pointe.

The sole evidence that might indicate that some decision-making/supervisory authority is exercised outside of the State of Indiana with respect to Eagle Pointe is the fact, acknowledged by Larry Swank, that he is a "hands on" manager, and that as a result he makes occasional trips to Michigan to the debtor's apartment facility. This is no more than would be true if Donald Trump were to testify about his involvement in a particular casino boat enterprise in the Northern District of Indiana: of course, an individual involved in critical management decisions concerning a facility located in a state apart from that of his principal office makes occasional visits to the facility in the context of making management decisions. While perhaps at some point Mr. Trump's casino boat will run into financial difficulty, this Court will certainly not determine that the focus of business decisions with respect to that facility is in Gary, Indiana as opposed to wherever it is that Mr. Trump maintains the hub of his business activities.

The *Peachtree* case is, in the words of Attorney Carlberg in his closing argument, "on all fours" with the instant case.[2]

**2.** This Court refers to a case *exactly* on point in all respects as a "pig case". *Peachtree* is only missing a hoof from being a "pig case": in *Peachtree,* the business locus of the manag-er of the single-asset property was in California, and not in the state in which the bankruptcy case was venued; in the instant case, testimony established that the locus of deci-

 The venue in which Eagle Pointe's Chapter 11 case was filed is presumed to be the proper venue for the case; the burden was upon TCF to establish by a preponderance of the evidence that the case was improperly initially venued; *Peachtree,* 150 F.3d at 792–793.

Based upon the record, the Court finds that the "nerve center" of Eagle Pointe is in the Northern District of Indiana, and that the debtor's Chapter 11 case was properly initially venued in the United States Bankruptcy Court for the Northern District of Indiana, South Bend Division.

We next move to TCF's contention that venue should be transferred pursuant to 28 U.S.C. § 1412/Fed.R.Bankr.P. 1014(a)(1).

28 U.S.C. § 1412 states:

A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

Fed.R.Bankr.P. 1014(a)(1) states:

**Rule 1014. Dismissal and Change of Venue**

(a) Dismissal and Transfer of cases

(1) Cases filed in proper district

If a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners, the United States trustee, and

other entities as directed by the court, the case may be transferred to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.[3]

The principal judicial determination with respect to analysis under the foregoing provisions—upon which both parties rely—is *Commonwealth Oil Refining Co., Inc.,* 596 F.2d 1239(5th Cir.1979), *rehearing and rehearing en banc denied,* August 9, 1979. The Fifth Circuit's analysis has been colloquially denominated as the "COMCO" test, by the parties before the Court. The Court deems the COMCO analysis to be the principally controlling analysis to be employed in a transfer of venue request under the foregoing provisions.[4]

 28 U.S.C. § 1412 and Fed. R.Bankr.P. 1014(a)(1) have two principal overriding rubrics which are to determine whether or not venue of a Chapter 11 case should be transferred to another court: in "the interest of justice" or "for the convenience of the parties". As stated in *Commonwealth Oil Refining Co., Inc.*—and as concurred in by both parties in their memoranda—the factors under the prong of "convenience of the parties" is to be determined by analysis under six elements:

Under the heading of convenience of the parties the bankruptcy court listed six factors:

(Bankr.N.D.Ind. [Hammond Division] 1988). This case, well-decided though it be by the Honorable Francis G. Conrad, the Judge of the United States Bankruptcy Court for the District of Vermont sitting by designation in the United States Bankruptcy Court for the Northern District of Indiana at a time of upheaval in the latter court, adds several factors to the COMCO test with which this Court is not in parallel. Thus, the principal analysis focuses on the COMCO factors, with a slight modification by the author of this decision.

---

sion-making for Sterling Management Ltd. is more properly placed in Indiana, the venue of the bankruptcy case. While the instant case might be missing a hoof with respect to *Peachtree,* the lack of that hoof only makes Eagle Pointe's pig a more worthy § 1408 participant.

**3.** The Court has determined that this Chapter 11 case was initially filed in the proper district; therefore, only sub-paragraph (a)(1) of Fed.R.Bankr.P. 1014 is applicable.

**4.** Both parties have cited to the case of *Toxic Control Technologies, Inc.,* 84 B.R. 140

92

(1) The proximity of creditors of every kind to the Court;

(2) The proximity of the bankrupt (debtor) to the Court;

(3) The proximity of the witnesses necessary to the administration of the estate;

(4) The location of the assets;

(5) The economic administration of the estate;

(6) The necessity for ancillary administration if bankruptcy should result.

*Commonwealth Oil Refining Co., Inc.*, 596 F.2d 1239, 1247. The COMCO factors principally focus on the element of "convenience of the parties". The concept of "interest of justice" is a totally subjective one. Neither of the parties has focused argument upon the equally available ground for transfer of venue of "interest of justice". This Court deems that principle to include the impact of venue on regulatory authorities who can be reasonably probably foreseen to be involved in a Chapter 11 case, and the Court will address its analysis on TCF's motion in this context as well.

■ In applying the COMCO factors, this Court deems the pertinent inquiry to be the *actual existence*, at the time that a hearing on transfer of venue is held, of relationships relevant to the COMCO factors. While a number of things might happen in the course of administration of a Chapter 11 case, a decision under 28 U.S.C. § 1412/Fed.R.Bankr.P. 1014(a)(1) cannot be focused on "mights"; rather, it must be focused on concrete facts that exist at the time that the motion is considered. A meteor the size of a small automobile "might" penetrate the earth's atmosphere and obliterate the court complex in South Bend, Indiana or in Detroit, Michigan; a fire in the cafeteria of either of those court facilities might cause the shutdown of either facility for a number of months; a *pro se* litigant "might" file a multi-million dollar wrongful eviction action against the debtor. Transfer of venue consideration by the Court focuses on what is, and not what might be.

■ Reviewing the six COMCO factors in turn, the Court's analysis is the following.

■ First, the Court is to consider the "proximity of creditors of every kind to the Court". Admittedly, Eagle Pointe's major creditor is TCF, and its proximity to the locus of bankruptcy court functions in the Eastern District of Michigan is closer than is the locus of court functions in the Northern District of Indiana. However, it is "creditors of every kind" that is to be considered. The debtor's Schedule F—which has not been controverted as a list of creditors by any evidence offered at the hearing—lists 34 creditors, with claims totaling $374,385.70. The principal unsecured creditor, with a designated claim of $360,292.00, is Eagle Pointe Apartments, LLC, whose principal location of business is Mishawaka, Indiana. While admittedly an "insider", this entity is nevertheless the principal unsecured creditor with a stake in the outcome of the debtor's Chapter 11 case. Without belaboring the point, certain of the creditors listed in Schedule F are general business creditors whose locus of business is meaningless in a Chapter 11 case. Perhaps the most critical focus is on tenant claims, and there are six claimants listed as having claims for "tenant deposit" in Schedule F. However, no evidence was adduced at the hearing that there has ever been an issue regarding tenant claims with respect to Eagle Pointe, apart from the evidence that several State Court landlord/tenant suits are pending in Michigan courts which the plaintiff has initiated. These suits don't implicate federal bankruptcy court issues: as essentially "collec-

tion" cases, these matters will proceed in State court regardless of which bankruptcy forum is selected.[5] As stated in Fed. R.Bankr.P. 3003(b)(1), the claims of all of the Schedule F creditors are deemed allowed without the filing of a proof of claim by any of them, and thus there is no foreseeable dispute at this time as to claim determination matters with respect to Eagle Pointe.[6]

It is admittedly inconvenient for TCF to appear in the United States Bankruptcy Court for the Northern District of Indiana, South Bend Division, with respect to matters which relate to its interests in this bankruptcy case. However, on balance, TCF is only one of a number of creditors whose interests are involved in this case, and the size of its claim in relation to the "proximity of creditors of every kind to the Court" whose interests may actually be implicated in this case is hardly a major factor. The Court finds, based upon the evidence of record, that the "proximity of creditors of every kind" element is a neutral factor.

The second factor is the "proximity of the bankrupt (debtor) to the Court". For the reasons stated previously, there is no question—and the record establishes that there is no question—that the United States Bankruptcy Court for the Northern District of Indiana, South Bend Division, is far more proximate to, and convenient for,

the debtor. This factor weighs entirely against TCF's motion.

The third factor is "proximity of the witnesses necessary to the administration of the estate". Without denigration of TCF's presentation—which was excellent in every way—the focus of TCF's presentation concerning this element was based upon TCF's involvement in the case, and the necessity of its utilization of witnesses of its business organization in matters which relate to its interests in the case. TCF made a valiant effort at the hearing to establish that its witness in all matters would be restricted to its witness at the hearing, Larry Czejha, or others from its home base in Michigan. However, while Mr. Czejha may be the most knowledgeable individual on behalf of TCF with respect to issues relating to this case, he is certainly not the only person with institutional knowledge as to the case. The evidence established that negotiations between Eagle Pointe and TCF occurred on several occasions at Eagle Pointe's business locus in Indiana, and that they were conducted by personnel other than Mr. Czejha. The Court is also not unmindful of the fact that issues between TCF and Eagle Pointe which require the personal knowledge of Larry Czejha relate predominantly to the authenticity of business records of TCF, the documentation of transactions between the parties, and the calculation of the amount of indebtedness

**5.** This Court deems these routine collection cases to be subject to State court jurisdiction, and this Court deems no bankruptcy Court in the country in its right mind to have determined collection cases of this nature to be subject to exclusive federal jurisdiction. Having personal acquaintance with several of the Judges in the Eastern District of Michigan, the Court deems them all to be in their right minds.

**6.** This is with the possible exception of one proof of claim filed on the Court's claims

docket which varies from the amount deemed allowable in Schedule F—no evidence regarding this matter was submitted at trial, and the Court will leave it to the parties to themselves to review the claims docket to ascertain who the claimant is. At the time of the hearing, the debtor had not objected to this claim; this claim is therefore deemed allowed; and thus there is nothing to consider with respect to any possible dispute between Eagle Pointe and the claimant.

owed by Eagle Pointe to TCF. Mr. Czejha is in no better position to authenticate documents than is a highly-placed employee in an office of TCF located in the Northern District of Indiana, and from the evidence adduced at the hearing, the Court is not convinced there is any dispute as to the underlying transactional documents between TCF and Eagle Pointe or, for that matter, the amount of the indebtedness owed by the debtor to the creditor. While it may be TCF's preference to have an experienced official of Mr. Czejha's qualifications participate directly in this case, the Court is far from convinced that the participation of an official of Mr. Czejha's qualifications, caliber and knowledge is necessary to deal with the issues that will arise in this case.

The principal witnesses necessary for the administration of this estate are Larry Swank and/or Lance Swank, and the record is irrefutable that their locus of operation, and in fact their residence, is in Mishawaka, Indiana—a location approximately 15 miles from the Court in which the case is presently venued. With all due respect, TCF's presentation was made with the assumption that it was the *only* party who would be interested in this case and whose witnesses would be necessary for the administration of this case. That is not true in the ordinary administration of a single-asset real estate case—the focus is on the debtor and issues that relate to the debtor, not on matters which relate to the principal creditor. Thus, this factor weighs heavily in favor of Eagle Pointe.

The fourth factor is the location of assets. Admittedly, the asset involved in this case is located in Michigan, within approximately 40 miles of the Bankruptcy Court locus for the Eastern District of Michigan. This factor weighs entirely in favor of TCF.

The fifth factor is "the economic administration of the estate". No concrete evidence was submitted as to the "over-secured" position of TCF with respect to its possible allowed secured claim under 11 U.S.C. § 506(a), and thus the Court could only conjecture as to the additur which might be occasioned to the debtor's estate by expenses allowable to TCF under 11 U.S.C. § 506(b). The Court will not so conjecture. While the Court will not quibble with the choice of TCF's principal counsel to handle its interests in this case—a choice which based upon the matters before the Court with respect to the motion is an admirable one—the Court does note that if economic factors were a consideration, there are several institutional firms located in South Bend, Indiana which major national litigants have employed to represent their interests exclusive of counsel more local to their business headquarters. The fact that TCF has chosen to be represented by counsel in Southfield, Michigan and by counsel in Indianapolis, Indiana, is not a factor which should weigh into this element, even assuming *in arguendo* that the expenses incurred by TCF can be passed through under 11 U.S.C. § 506(b). The debtor's representation, on the other hand, is by a counsel in Indianapolis, and the Court deems the expenses incurred for his representation in South Bend, Indiana in contrast to the expenses incurred for his representation in the Eastern District of Michigan to be essentially the same. The focus thus becomes a relatively minor thing: the travel expenses of the principals involved in the administration of the debtor. Although those expenses for Larry and/or Lance Swank may be relatively minimal with respect to travel to hearings in Detroit, Michigan, those expenses are proportionally significantly more for travel to Detroit than for travel to South Bend. Moreover, the testimony of Larry Swank at the hear-

ing established that the day-to-day operations of the debtor will experience significant upheaval by his having to travel to Detroit for hearings, as opposed to his having to travel to a venue which is 15 miles from the locus of the debtor's "nerve center". The evidence failed to establish that there is much significance with respect to this fifth factor, but this factor slightly favors Eagle Pointe.

The last factor, "necessity for ancillary administration", is a nullity with respect to this case. As stated above, much of TCF's presentation was focused on "what if". There was no concrete evidence at the time of the hearing that "what if" would create any realistic need for an "ancillary administration". In fact, the evidence adduced at the hearing indicated to the Court that an accommodation among the necessary parties in this case is near at hand, which will negate entirely any possible "ancillary administration". This factor is a nullity under the evidentiary record in this case.

From the scorecard derived from the foregoing analysis, Detroit wins one outright; South Bend wins one outright; South Bend leads significantly in another factor and leads marginally in another; one factor is a tie; and the sixth factor doesn't count at this stage of the game. This is a six inning game; the game is completed, and South Bend wins.

■ Finally, the Court requested the parties in their evidentiary presentations and in their closing arguments to address the issue of the impact of this case on regulatory authorities who are probably foreseeable to be, or might be, involved in Eagle Pointe's Chapter 11 case. It has been the Court's experience—in 30 years of bankruptcy practice—that the impact of Chapter 11 cases on taxation and regulatory authorities is often overlooked, and that because of those authorities' scarce re-

sources there can be a real hardship imposed upon them with respect to protecting their interests in a far-away venue. There is no evidence that there are any problems with the Internal Revenue Service as a taxing authority, and even if there were, the Court is more than well-situated to advise the parties that representation of the Internal Revenue Service is equally available at the same cost in all venues. There was no evidence that the debtor has experienced any problem with general taxing authorities in Michigan, and thus that factor does not impinge on this case. The evidence did establish that there is a tax assessment appeal pending in Michigan with respect to real property taxation concerning Eagle Pointe; however, absent a request for a Court's determination of that dispute under 11 U.S.C. § 505—which there has not yet been, if ever there will be—the possibility of the bankruptcy court's involvement in such a dispute is not established by the evidence in this case. In reference to the record established for the purposes of TCF's motion, any proceedings regarding assessment appeals will be conducted by the local taxing authority in its home jurisdiction. There was no evidence that the debtor is involved in any dispute whatsoever concerning its present "affordable housing" status. There was no evidence of any dispute that Eagle Pointe has in any manner violated any civil rights concerns of any local authority. There was no evidence that Eagle Pointe has violated any concerns of a local environmental enforcement authority. There was no evidence that Eagle Pointe is involved in a dispute with any local building enforcement authority, or landlord/tenant regulatory authority. Thus, based upon the record, there is no evidence that any regulatory interest of an authority in proximity to a court in the Eastern District of Michigan

is implicated in this case. While certainly the State of Michigan and local governmental entities have an interest in this case, there is no evidence whatsoever that those interests will generate any dispute which must be decided by a court in this Chapter 11. TCF argued that the Judges in the Eastern District of Michigan will be somehow more attuned to the issues which might arise in a single asset real estate "affordable housing" case in Ann Arbor, Michigan than will be the judge in South Bend. Speaking for the author of this opinion, and for the Chief Judge for whom he assumed this matter, given the economic circumstances in this venue, that contention is simply unfounded, and indeed somewhat offensive.

There is no consideration under the "interest of justice" rubric which favors transfer of venue.

As stated previously, there is a presumption that venue of this case in the United States Bankruptcy Court for the Northern District of Indiana, South Bend Division, is proper. The burden was upon TCF to establish by a preponderance of the evidence that transfer of venue to the United States Bankruptcy Court for the Eastern District of Michigan was either "in the interest of justice" or was "for the convenience of the parties". As stated above, the Court finds that TCF has failed in its burden, and thus that venue of this Chapter 11 case should remain in the United States Bankruptcy Court for the Northern District of Indiana, South Bend Division.[7]

Based upon the findings of fact and conclusions of law stated above, the Court finds that the Motion of TCF National

Bank to Change Venue filed on August 4, 2006 should be denied.

IT IS ORDERED that the Motion of TCF National Bank to Change Venue is denied. Dated at Hammond, Indiana on September 6, 2006.

---

7. The Court commends Attorneys Miller and Carlberg and Edgar for their exemplary presentation to the Court of the issues determined by this decision. The Court had yet to experience the caliber of representation in a motion of this nature that it encountered in this contested matter, until experienced in this proceeding.